870 A.2d 653 (2005)
376 N.J. Super. 323
STATE of New Jersey, Plaintiff-Respondent,
v.
Josephine CASTAGNA, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Jean P. Morales, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Thomas J. D'Amico, Defendant-Appellant.
Nos. A-4471-01T5, A-4530-01T4 and A-6863-01T5.[1]
Superior Court of New Jersey, Appellate Division.
Argued October 26, 2004.
Decided April 12, 2005.
*657 Jean D. Barrett, Montclair, argued the cause for appellant Josephine Castagna (Ruhnke & Barrett, attorneys; Ms. Barrett, on the brief).
Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant Jean P. Morales (Yvonne Smith Segars, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).
Alan L. Zegas, Chatham, argued the cause for appellant Thomas J. D'Amico (Law Office of Alan L. Zegas, attorney; Mr. Zegas and Mary Frances Palisano, on the brief).
Steven J. Kaflowitz, Assistant Prosecutor, argued the cause for respondents (Theodore J. Romankow, Union County Prosecutor, attorney; Mr. Kaflowitz, of counsel and on the brief in A-4530-01, Mr. Kaflowitz and Patricia L. Cronin, on the briefs in A-4471-01 and A-6863-01).
Appellant Jean P. Morales, filed a pro se supplemental brief.
Before Judges KESTIN, LEFELT and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
The legal issues raised by these three appeals arise from one violent incident that brutally took the life of a man named Bennett Grant. The details of this crime reveal the darkest aspects of the human character and provide a limited insight into the dynamics of mob behavior and how it can, at times, overtake the individuals composing the group. Notwithstanding our unmitigated condemnation of the indisputably barbaric acts that brought about the destruction of this human life, we are compelled to reverse the convictions of all three defendants who are the subject of these appeals, and remand these matters for a new trial.
Our decision to reverse is based on an erroneous legal ruling that operated to deprive all three defendants of their right to confront the witnesses against them, as guaranteed by the Sixth Amendment of the Constitution of the United States, as applied to the states by the provisions of the Fourteenth Amendment, and as independently embodied in Article I, Paragraph 10 of the New Jersey Constitution. This constitutional deprivation came about when the trial court precluded defense counsel from cross-examining a key prosecution witness on the results of a stipulated polygraph examination, because these defendants were not parties to the stipulation.
We hold that when the State enters into an agreement with a witness, stipulating to the admissibility of the results of that witness's polygraph examination, a defendant has a constitutional right to confront that witness, in cross-examination, *658 with the results of the polygraph, as a means of impeaching that witness's credibility. As a matter of fundamental fairness, we also hold that, under these circumstances, the State is precluded from disavowing the reliability of the polygraph results.
With respect to Morales, we further hold that the trial court committed reversible error when it failed to sua sponte instruct the jury on the elements of passion/provocation manslaughter, as a lesser included offense of the crime of murder.
Finally, with respect to D'Amico, we further hold that his trial counsel's performance fell far below the standard of competence expected of a criminal trial lawyer in this State. As a result, D'Amico was denied the effective assistance of competent counsel, in violation of the Sixth Amendment of the Constitution of the United States.

I
Defendants, Jean Morales, Josephine Castagna, and Thomas D'Amico, were tried together as individual assailants and as part of the mob that chased down and killed Grant.
Morales was convicted of murder, by purposely or knowingly causing serious bodily injury to the victim, resulting in his death, N.J.S.A. 2C:11-3(a)(1) or -3(a)(2); first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a); third-degree possession of a weapon with a purpose to use it unlawfully against the person of another, N.J.S.A. 2C:39-4(d); and fourth-degree possession of a weapon under circumstances not manifestly appropriate for such lawful uses as it may have, N.J.S.A. 2C:39-5(d). The weapon allegedly used by Morales was a large Belgian block type stone. The State argued to the jury that Morales dropped the stone on Grant's head, while he laid on the ground, battered, bruised and defenseless. On the murder conviction, Morales was sentenced to a term of fifty years, with a thirty-year period of parole ineligibility. The court merged the remaining charges.
D'Amico, who was a full-time police officer for the City of Elizabeth at the time this incident took place, was convicted of first-degree aggravated manslaughter, by recklessly causing Grant's death under circumstances manifesting extreme indifference to the value of human life, N.J.S.A. 2C:11-4(a); and two counts of second-degree official misconduct, N.J.S.A. 2C:30-2(a).
On the conviction for first-degree aggravated manslaughter, D'Amico was sentenced to a twenty-year term of imprisonment, eighty-five percent of which to be served without parole eligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and to consecutive seven-year terms of imprisonment on the conviction for second-degree official misconduct.
Castagna was convicted of the lesser-included offense of second-degree aggravated assault, attempting to cause serious bodily injury, N.J.S.A. 2C:12-1(b), and acquitted of murder, aggravated manslaughter, and two weapons offenses. She was sentenced to an eight-year term of imprisonment with an eighty-five percent NERA disqualifier.
In addition to these three defendants, the State also indicted Violet Arias, Carmine Perrotti, Alvin Baez, and Edward Gentile. All of these defendants pled guilty, pursuant to negotiated plea agreements, to second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b), with a sentence recommendation of seven years *659 imprisonment. Except for Baez,[2] all sentences were subject to an eighty-five percent period of parole ineligibility pursuant to NERA. N.J.S.A. 2C:43-7.2. As an express condition of their agreements with the State, all of the individuals who pled guilty also agreed to testify as witnesses for the prosecution against the three defendants who elected to stand trial.

II
Defendants have raised a number of arguments in support of their appeals. We include here all of the arguments in their entirety, linking each defendant with his or her argument points.
Defendant Morales raises the following issues:
POINT I
A JURY INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER SHOULD HAVE BEEN GIVEN. (Not Raised Below)
POINT II
THE TRIAL JUDGE SHOULD HAVE GRANTED THE DEFENSE MOTION TO USE THE STIPULATED POLYGRAPH OF VIOLET ARIAS TO IMPEACH HER CREDIBILITY REGARDING WHETHER SHE STRUCK THE VICTIM WITH AN OBJECT.
Defendant Morales raises the following additional issues in a supplemental pro se brief, which we set forth exactly as presented:
POINT I
TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN THE FAILURE TO SECURE DEFENSE AN INTERROGATION EXPERT TO PROVE POLICE COERCIVE INTERROGATION TECHNIQUES THAT LEAD TO THE FALSE STATEMENTS/TESTIMONY OF APPELLANT AT BAR AND THUS A DENIAL OF THE 14TH AMENDMENT U.S. CONST. AND DUE PROCESS-EQUAL PROTECTION RIGHTS, TO PERFECT THE FULL BALANCE OF APPELLANT'S 6TH AMENDMENT U.S. CONST. TO DEFEND IN HIS TRIAL.
POINT II
APPELLANT'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILURE TO ARGUE AND SECURE DEFENSE OWN PATHOLOGIST TO CHALLENGE RESPONDENT'S EXPERT MEDICAL OPINION AS TO THE CAUSE OF DEATH. CONTRARY TO THE U.S. CONST. 6TH AMEND. 14TH AMEND. AND N.J. CONST. ART. 1 PARA. 1, 9, AND 10, AS TRIAL COUNSEL SHOULD HAVE REQUESTED A CAUSATION JURY CHARGE IN THE INSTANT MATTER.
POINT III
APPELLANT'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO REQUEST A FACT-SPECIFIC, CROSS-RACIAL IDENTIFICATION CHARGE WHEN THE VICTIM WAS OF A BLACK AFRICAN AMERICAN DECENT AND APPELLANT A HISPANIC. THUS DENYING HIS RIGHT TO A FAIR TRIAL PURSUANT TO THE U.S. CONST. 14TH AMEND. DUE PROCESS/EQUAL PROTECTION CLAUSES AS TRIAL COURT ERRED FOR FAILURE TO SUA SPONTE CHARGE SAME.
POINT IV

*660 APPELLANT WAS DENIED ALL HIS CO-DEFENDANT'S PLEA DEAL BEFORE HIS TRIAL AND DENIED AN OPPORTUNITY TO BE OFFERED THE SAME THAT'S CONTRARY TO A FAIR PROCEEDING AND DUE PROCESS/EQUAL PROTECTION RIGHTS, PURSUANT TO THE U.S. CONST. 14TH AMEND. AND N.J. CONST. ART. 1 PARA. 1, 9, AND 10.

POINT V
APPELLANT WAS DENIED THE ACCOMPLICE CHARGE WITH THE DISTINCTIONS BETWEEN THE SPECIFIC INTENT REQUIRED FOR THE GRADES OF THE OFFENSE AND THUS WAS DENIED A FAIR JURY WEIGHING PROCESS TO BE FOUND GUILTY OF A LESSER OFFENSE CONTRARY TO HIS 14TH AMEND. U.S. CONST. RIGHTS AND N.J. CONST. RIGHTS PURSUANT TO ART. 1, PARA. 1, 9, AND 10, ABRIDGING HIS DUE PROCESS/EQUAL PROTECTION RIGHTS.

POINT VI
TRIAL COURT ERRED IN NOT SUA SPONTE CHARGING THE JURY WITH INTOXICATION DESPITE SAME NOT BEING REQUESTED BY ANY COUNSELS AND EVIDENCE WARRANTED TO THE CONTRARY. THUS BEING APPELLANT RIGHT TO A FAIR TRIAL PURSUANT TO THE UNITED STATES CONST. 14TH AMEND. AND N.J. CONST. ART. 1, PARA. 1, 9, 10. THAT ABRIDGED APPELLANT'S PROTECTIVE DUE PROCESS/EQUAL PROTECTION RIGHTS.

Defendant D'Amico raises the following issues:
POINT ONE
DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED BECAUSE OF THE DEFICIENT PERFORMANCE OF HIS TRIAL COUNSEL.
POINT TWO
DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL WERE VIOLATED BY THE TRIAL COURT'S INSTRUCTION TO THE JURY ON ACCOMPLICE LIABILITY.
POINT THREE
DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO PRECLUDE ANY TESTIMONY REGARDING RACIAL EPITHETS, OR IN THE ALTERNATIVE, TO SEVER THE TRIAL, PARTICULARLY WHERE THIS TESTIMONY SERVED NO PURPOSE OTHER THAN TO INFLAME THE JURORS AND PREJUDICE THE DEFENDANT.
POINT FOUR
DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE COURT'S FAILURE TO VOIR DIRE THE JURORS REGARDING THE PRESSURE BEING PLACED UPON THE JURY POOL BY A JUROR WHO ANNOUNCED THAT SHE DID NOT WANT TO BE INVOLVED AND WANTED THE JURORS TO RUSH TO A VERDICT.
POINT FIVE
THE TRIAL COURT ERRED IN IMPOSING A CONSECUTIVE SENTENCE THAT WAS DISPROPORTIONATELY SEVERE WHEN COMPARED *661 TO THE DEFENDANTS WHO PLED GUILTY AND ADMITTED TO GREATER OR SIMILAR CULPABILITY IN THE OFFENSE.
POINT SIX
DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT PERMITTING THE STATE TO ALLOW VIOLET ARIAS TO TESTIFY DESPITE HAVING INFORMATION THAT HER TESTIMONY WAS UNTRUTHFUL.
Defendant Castagna raises the following issues:
POINT I
THE TRIAL COURT'S ERRORS IN ITS JURY CHARGE AND IN THE VERDICT SHEET DEPRIVED JOSEPHINE CASTAGNA OF HER RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS OF LAW AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS.
A. General Law Governing Jury Instructions.

B. It was Error to Refuse to Charge the Jury on the Defense of Renunciation.

C. By Using Examples Contrasting Purposeful Conduct Only with Accidental Conduct, to the Exclusion of Examples of the Intermediate Degrees of Culpability, the Trial Court Instructed the Jury that, In Effect, All Voluntary Conduct Is Purposeful.

D. The Charge and the Verdict Sheet Failed to Include the Option of Attempt in Connection with Third-Degree and Simple Assault.

POINT II
THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULINGS DEPRIVED JOSEPHINE CASTAGNA OF HER RIGHTS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS.
A. The Court Erred When It Excluded from Evidence Testimony That Violet Arias Had Taken a Polygraph and Was Determined to Have Been Deceptive in Her Answers Related to Ms. Castagna's Role in the Offense.

B. The State Was Permitted to Knowingly Elicit False Testimony from Violet Arias That Josephine Castagna Had Struck the Victim with a Metal Object.

C. The Testimony that Ms. Castagna and Others Made Racist Statements Should Have Been Excluded.

POINT III
THE APPLICATION OF THE NO EARLY RELEASE ACT (NERA) IS PRECLUDED BY THE ACQUITTALS OF MS. CASTAGNA ON THE WEAPONS COUNTS.
POINT IV
MS. CASTAGNA'S SENTENCE WAS DISPROPORTIONATELY SEVERE WHEN COMPARED TO THE DEFENDANTS WHO PLED GUILTY AND ADMITTED TO GREATER CULPABILITY IN THE OFFENSE.
We will first recite the relevant facts affecting all three defendants. Thereafter, we will focus on the facts necessary to address arguments unique to each defendant.

III

A

COMMON CORE OF OPERATIVE FACTS
On the night of October 23, 1999, Arthur McKeown and his friend Bennett Grant went to Sinners Go-Go Bar (Sinners), which was located at the corner of Bayway Avenue and South First Street in the City *662 of Elizabeth. The relocated Bayway Avenue Bridge was located about 300 to 400 yards down the street from Sinners. Grant was a thirty-seven-year-old African American man who stood over six feet tall and weighed 220 pounds.
Sinners was configured in three rooms: (1) a main bar area just off the front door with a stage and a wide screen television; (2) a smaller sports bar in the back with video games and a pool table; and (3) a private room off to the side of the main bar area, where private parties were often held. On October 23, there was a private birthday party in the side room, and many city sanitation workers were in attendance. The front window of Sinners was covered with a black plastic, but there were surveillance security cameras positioned outside the front and back doors and inside the sports bar, and the corresponding monitors were placed near the front bar. Working at Sinners that night were Pablo Fragoso, the night manager in charge of operations; Tony Velez, the doorman who could see the surveillance monitors; and Joseph Machado, the general manager for the parent corporation. Many of the patrons that night were there to watch a televised boxing bout.
At about 11:00 p.m., Carmine Perrotti, Lewis Rodriguez, Christopher Longo and defendant D'Amico arrived at Sinners in Perrotti's maroon Jeep Cherokee. That night, D'Amico was off duty as a full-time police officer for the Elizabeth Police Department. He had held this position since July 1996. The four men went to the main bar to drink and watch the boxing match. They were seated across the bar from McKeown and Grant. Longo went home after the boxing match.
About 11:30 p.m., Violet Arias, Ann Truzzolino, Alvin Baez and defendant Castagna entered the back door of Sinners and went into the sports bar. Arias was five foot two, thinly built, and was wearing a white t-shirt and a red vest. All of these individuals, including the three co-defendants involved in this appeal, knew each other either from high school or from the neighborhood.

B

The Confrontations  Inside and Outside the Bar
Witnesses' accounts of what transpired at this point varied widely. There is a general consensus, however, that: (1) Arias had some sort of confrontation with Grant and McKeown outside Sinners around 2:00 a.m.; (2) Grant went back inside Sinners and another conflict developed with Arias in the bar, which eventually spilled out onto the street; (3) as a result, a crowd gathered outside Sinners and surrounded Grant; (4) Grant broke free and ran down Bayway Avenue towards the relocated bridge with the crowd chasing him; (5) all of the people named in the indictment pursued Grant; and (6) all of the pursuers and, indeed, most of the other patrons in Sinners that night, had consumed alcohol, some to the point of inebriation.
McKeown described the situation as "like a riot." He heard screaming and saw a couple of women, including Arias, running out of Sinners towards Grant. Arias started "swinging" at Grant, while other patrons came out of the bar and joined in a circle around him.
Velez (Sinner's doorman) observed Arias run past him with a beer bottle. He saw Arias grab Truzzolino and start pulling her back to the bar. Grant walked inside the bar, and Arias was "[v]ery angry" and kept yelling at Velez to tell Grant "to get the fuck out of here." Grant went to where McKeown was sitting, and they both left the bar. As they were leaving *663 they told Velez they did not want any trouble and shook his hand. A few seconds later, a group of men and women ran past Velez and surrounded Grant and McKeown in the street. Velez saw them "punching and kicking the two gentlemen." Grant and McKeown were "trying to fight back," and then they ran away with the crowd chasing them towards the relocated bridge. A car pulled up, some people in the crowd got in, and the car sped towards the bridge.
Machado (Sinner's general manager) testified that, while walking out of the side room into the main bar, he saw Grant approach a petite woman standing right under the loud music speakers, say something to her for two seconds, and then turn to walk out the front door. The woman "jumped back like in a defensive mode like he had said something really bad or nasty." He (Machado) grabbed her in a bear hug, but she slipped out from underneath his hug and ran out the back door that led to Sinners's parking lot. Machado went to look in the monitors and saw the woman and Grant both making wild hand gestures as if they were arguing. They started walking out of range of the camera, and Machado lost sight of them.
Fragoso (Sinner's operations manager) generally corroborated Machado's account of events. He added, however, that he never saw any physical contact between anyone inside the bar. After Arias ran out the back door, he went out the front door and saw Arias holding Grant's dreadlocks. She was attempting to punch him. Grant did not try to hit Arias; instead he blocked her punches with his arm while attempting to back up and get away. Fragoso went over, got between them, and tried to split them apart. Arias grabbed at Fragoso and attempted to twice kick him in the groin. Arias started screaming at him and said, "This fuckin' nigger hit me, he hit me." Fragoso described Arias as "in a rage" and "out of control." She was "repeatedly calling him [Grant] a racial epithet."
When Fragoso finally got free from Arias, he turned to talk to Grant. By this time, Grant was surrounded by people who had grabbed him and were screaming "hostile words" at him. Although Fragoso could not hear any specific words, he recognized D'Amico and Perrotti as part of that group. At one point, Fragoso saw Grant break free from the group and start running towards the bridge. In response, the men and women who had attempted to encircle Grant began chasing him.
A patron who witnessed what had taken place outside, via the bar's closed circuit television monitor, left the bar to check on his car. Once outside, he saw a group of people, including D'Amico, surrounding and punching Grant, while the latter attempted to get away. Eventually, Grant broke free from his attackers and ran towards the bridge while the crowd gave chase.

C

The Chase
Morales arrived at Sinners just as the confrontation outside the bar was taking place. By this time, the crowd that had been chasing Grant had degenerated into a raging mob. Perrotti tossed Rodriguez the keys to his maroon Jeep and followed the crowd on foot. Rodriguez drove the Jeep with Alex Montalvo in the backseat behind him. Rodriguez made a U-turn and drove the Jeep toward the bridge. He testified that he drove to the bridge in order "to get my friends and just get out of there."
Fragoso followed the mob as it raced down the street after Grant. At one point, Grant turned into the driveway of an *664 apartment building. When Fragoso reached the driveway, he saw that the mob had stopped by a fence. Although Fragoso did not actually see it, Grant had apparently jumped the fence onto Burlington Avenue. As Fragoso came out of the driveway, he saw a number of individuals running toward the bridge. As he reached the bridge, Fragoso noticed the Jeep parked in the middle of the street with all of its doors open.
Elizabeth Mojica resides in the area where the bridge is located. She saw Grant running from the rear side of her house to the front and then onto the bridge. She also saw the mob continue to chase Grant and heard female voices yelling, "Get him. Kill him. Fuck'em up. Get his black ass . . . He had no business doing this to me." At this point in the testimony, the trial judge instructed the jury that, because the State was not alleging racial bias as a motive for the attack, the jury could only use the statements as evidence of the individuals' mental state.
Elizabeth's husband, Jose Mojica, testified that he saw the Jeep stop and pick up two people. The Jeep then went the wrong way on the relocated bridge, heading straight toward Grant. Mr. Mojica then saw the front passenger side door of the Jeep swing open and hit Grant. In an attempt to keep his balance, Grant grabbed the front of the vehicle. The Jeep then suddenly stopped and jerked forward, knocking Grant to the ground with the right front bumper. Arias and Baez corroborated the Mojicas' testimony.
The mob reached Grant, as he laid directly in front of the Jeep. Testimony from those who were on the bridge and from the residents in the area provide a chilling description of the chaotic and violent scene that transpired next. Punctuated by the screams of the participants, exhorting each other to the point of convulsive frenzy, the mob kicked, stomped and beat Grant as he laid in front of the Jeep.
Specifically: (1) Gentile, who pled guilty to reckless manslaughter, admitted that he "kicked [Grant] once or twice" in his buttocks and lower back; (2) Baez, who pled guilty to aggravated assault with serious bodily injury, admitted that he kicked Grant a couple of times on the right side of his face and that Grant had his hands over his face; and (3) Arias, who pled guilty to reckless manslaughter, admitted that she forcefully kicked Grant twice in the head. Each of these three witnesses also implicated D'Amico, Castagna, and Perrotti, as individuals who also kicked Grant. In fact, Gentile testified that "everybody was getting their kicks in."
Although Fragoso's testimony was generally corroborative, he did not see Castagna kick Grant more than once or twice in the back. In fact, as compared with the others, Castagna appeared to have used less force in her kicks. He testified that after she kicked Grant, Castagna was trying to pull Arias away from the scene, telling her "We got to go. We got to get out of here."
According to Morales's statement to police, he hit or kicked Grant two or three times "in the back and punched him in the shoulder and punched him in the chest and then [Morales] got bumped out of the way by someone." Morales also stated that, while Grant was being kicked and beaten, a woman was also "beating the shit out of" him with what looked like a bat or a stick or a pipe.
Fragoso identified Arias as that assailant. He described the object used by Arias to beat Grant as some type of car or truck molding, about two feet in length and three to four inches in width, flat on one side, and black with a chrome strip running through it on the other side. According *665 to Fragoso, Arias was enraged, and repeatedly called Grant a racial epithet while she swung the piece of chrome.
Arias denied that she struck Grant and accused Castagna of beating Grant with a "pipe, kicking him and saying, `Why the fuck did you hit me, you stupid nigger.'" Gentile and Baez corroborated Arias's testimony in this respect. Gentile described the object that Castagna allegedly used against Grant as a "broomstick." Baez simply stated that it was "a long object."
As Grant laid on the ground, helplessly enduring the mob's barrage of blows and kicks, the most egregious assault upon his person was about to take place. According to Fragoso, he saw a "Hispanic [man], five-nine, five-ten, heavy build, short black hair, [wearing a] gray fleece, blue jeans with reflective letter on his pants" holding a rock. This object was subsequently identified as a Belgian block weighing approximately twenty-five pounds. Using both his hands, the assailant raised the block above his head and "immediately dropped it on the victim's head."
Baez identified Morales as the person who threw the stone block at Grant's head. He had known Morales for two and a half years prior to the trial. Baez characterized his relationship with Morales as "good friends." He testified pursuant to a plea agreement in which the State agreed to dismiss pending homicide charges, in exchange for his plea of guilty to one count of second-degree aggravated assault. As to his sentencing exposure, the State agreed to recommend a seven-year term of imprisonment, without any period of parole ineligibility.
Rodriguez, who described himself as Morales's "acquaintance," testified that he saw him carrying the Belgian block and heading in the direction where Grant was located. Although he grabbed Morales's arm in an unsuccessful attempt to stop him from going forward, Rodriguez did not witness Morales drop the stone on Grant's head. Rodriguez was not charged with any criminal wrongdoing in connection with this case.
There was total silence after the block was dropped on Grant's head. Fragoso testified that it looked as if part of the victim's forehead had fallen off, blood was "gushing out," and his breathing became erratic. Fragoso dropped to his knees to check on Grant and pushed the crowd away.
At this point, someone in the crowd said, "Let's get out of here." Rodriguez grabbed D'Amico and yelled out to Perrotti, and the three men joined Castagna, Arias and Montalvo in the Jeep. Perrotti drove the Jeep in reverse back down the bridge, turned it around, and went back to Sinners. He told everyone to get out of the jeep, except for D'Amico and Morales.

D

The Aftermath
After interviewing various witnesses at the scene, the police obtained a description of the Jeep. Soon thereafter, a marked police unit saw a Jeep fitting that description. The police observed the Jeep make a U-turn in the middle of the street and park. As they pulled up behind the Jeep, the officers recognized D'Amico and Perrotti, but not Morales, whom the police described as a Hispanic man, wearing a fleece-type gray or light blue jacket, blue jeans and work boots. When questioned, D'Amico admitted that he and his two companions had been at Sinners earlier that night to watch the boxing match. He denied any involvement in the assault. Based on this misinformation, the police officers left the area and returned to Sinners.
*666 At Castagna's brother's house, D'Amico blamed Truzzolino for the incident. According to Arias, D'Amico was specifically concerned that Truzzolino was "going to crack" and tell police what happened. Also according to Arias, D'Amico asked Morales, "Why would you throw that brick on the guy's head," and Morales answered, "The hell with it. If I get caught, I get caught."
Truzzolino testified, but had not included in any earlier statement, that she saw Castagna walking around and holding ice to her temple at her brother's house. Although Baez corroborated this testimony, another woman present, who had not been at Sinners or involved in the incident in any way, testified that Castagna had no visible injuries to her head or face.
At one point, the officers who had had the earlier encounter with D'Amico realized that Morales matched the physical description of the person who had wielded the block. When they returned to the parked Jeep, D'Amico came out of a house to talk to them. According to Baez, when D'Amico returned to the house to get Perrotti, he told Morales that the police were looking for him. He had deliberately misspelled Morales's name in order to divert their investigation.
When D'Amico went back outside to talk to police, he vouched for both Perrotti and Morales. He specifically stated that Morales could not be involved because "he was with me all night." Despite these misrepresentations, the police decided to tow the Jeep and detain Perrotti. They also told D'Amico that he was free to leave, because he was not considered a suspect. In response, D'Amico declared, "No, I have to stay with my man." The police then transported Perrotti and D'Amico to headquarters in separate cars. D'Amico was released the next day. After giving a statement, Perrotti was also released.
According to Arias, some of the assailants met the next morning to discuss the status of the police investigation. D'Amico reported that the police had found the Belgian block and the pipe. Based on his conversation with Machado, D'Amico also confirmed that the security cameras at Sinners were not attached to video-recorders.
D'Amico also tried to convince Morales to surrender himself to the police. According to Baez, D'Amico told Morales that the police were under the impression that he had picked up Morales immediately before the police saw them in the parked Jeep. According to Arias, given the absence of videotapes establishing otherwise, Morales intended to deny being on the bridge and at Sinners that night. Arias also testified that Castagna was worried that her fingerprints were on the pipe. D'Amico also told Castagna not to mention that he had struck Grant with the Jeep's door.

E

Cause of Death Evidence
Grant was prone with his head turned toward the left side of his body when the emergency medical personnel responded to the scene. He was unconscious, having difficulty breathing, and his face and head were swollen and covered with blood. Brain matter and blood emanated from his nose, his eyes were swollen shut, and there was a large pool of blood adjacent to his head. After approximately five months in the hospital, Grant died.
Dr. Carlos Fonseca, an assistant medical examiner for the Union County Medical Examiner's Office, performed the autopsy. Dr. Fonseca was qualified at trial as an expert in forensic pathology. He concluded that Grant's death was caused by complications from multiple head traumas, *667 consistent with being kicked and beaten with blunt objects. In Dr. Fonseca's opinion, no single blow caused Grant's death.
Dr. Douglas Miller testified for the State as an expert in neuropathology. He examined Grant's brain at Dr. Fonseca's request. Dr. Miller concluded that Grant's death was caused by the totality of his injuries. In his opinion, within a reasonable degree of medical certainty, Grant died as a result of "multiple blows" to the head and torso. The cumulative effect of these forces caused multiple contusions in the victim's brain.
The prosecutor also asked Dr. Miller to determine the cause of death independent of the trauma caused by the Belgian block being dropped on the victim's head:
Q. Now, I am going to give you a hypothetical question. If you took the rock injury out of this case and if Mr. Grant had not been struck on the head by a rock but rather he had only been kicked or hit with objects other than the rock, do you have an opinion to a reasonable degree of medical certainty whether the injuries caused by these other blows would have caused his death?
A. I do.
Q. And what is your opinion?
A. They would have.
Q. And what is that based upon?
A. It's based on the fact that contusions such as Mr. Grant's brain exhibits at the time of the examination are frequently seen to be the result of the kinds of blows that you just mentioned, kicks, punches, clubs such as a baseball bat or a pipe or whatever and one does not need to have dropped a rock on someone's head to produce fatal lesions of this kind. It is in my business a common experience to see people who died either acutely or after complications from neurological damage from just such assaults.
Q. Now, in this case you are aware that the immediate cause of Mr. Grant's death was complications related to head trauma?
A. Yes.
Q. Would Mr. Grant have died of these complications absent the blunt head trauma?
A. No.
Q. And is that opinion to a reasonable degree of medical certainty?
A. Absolutely.
Q. And could you tell the jury again the basis for your opinion?
A. In the autopsy report it's clear that the cause of death relates to a combination of heart disease and lung disease and in particular that there were lung infarcts, death of lung tissue which overwhelmingly would be probably due to a reasonable medical certainty to clots forming in blood vessels and traveling to the lungs, what are called pulmonary emboli. That happens to people who are stationary in a bed for long periods of time. The heart disease is related at least in some part to natural disease process but would have been exacerbated by a patient whose heart rate is no longer regulated by the brain, can't respond to stress by increasing heart rate in a patient who has to be breathed for by a ventilator who is on multiple medications in a vegetative state. He would not have had those complications because he would not have been in a vegetative state, he would not have been in a bed stationary for five months if he hadn't had the brain damage to begin with.
Thus, the State's theory as to cause of death rested upon the cumulative effect of the trauma inflicted by the defendants, *668 both as individuals and by acting in concert with the remaining members of the mob.

IV

The Polygraph Evidence
Defendants have raised a number of legal issues which, for the most part, are unique to their particular factual circumstances. The legal propriety of the trial court's ruling precluding defense counsel from cross-examining Arias as to the results of a State-administered polygraph examination, however, has been raised by all three defendants and, as such, is amenable to holistic analysis and resolution.

A
In the course of being questioned by law enforcement investigators, Arias gave three materially different versions of the events surrounding Grant's death. She gave the first statement on October 26, 1999. In this version, Arias denied any personal involvement in the attack. She also stated that, other than Morales, she did not see any other defendant take part in the assault against Grant. Despite this initial unwillingness to implicate directly any other participant, Arias placed Castagna at the bridge, and obliquely referred to the possibility of finding Castagna's fingerprints on the pipe used to beat Grant. The following day, armed with Arias's statement as well as the statement of an independent witness who claimed to have seen a woman beat Grant with a metal object, the police arrested Castagna and charged her with aggravated assault.
On September 4, 2001, Arias was again interviewed by law enforcement authorities. This time, she told the investigating officers that parts of her earlier statement were not truthful. Specifically, in direct contradiction to her earlier statement, Arias admitted to having assaulted Grant. She claimed, however, that her participation in the assault was limited to kicking Grant "in the legs," but denied striking him with any object. This time she directly implicated all those initially charged in the indictment, and specifically identified Castagna as the woman who kicked and hit Grant with a pipe.
After giving this second statement, Arias agreed to submit to a State-administered polygraph examination. In this agreement, Arias and the prosecutor stipulated that the results of the polygraph test would be admissible as evidence in her trial. Detective Laurent Gauthier of the New Jersey State Police Polygraph Unit conducted the polygraph examination.
The State Police report authored by Detective Gauthier provides the following description of the purpose and scope of the polygraph examination:
The purpose of the examination was to determine if the above named subject was being truthful when she denied ever striking Bennett Grant on his head during an assault involving the examinee and six other codefendants which took place on the relocated Bayway Bridge, Elizabeth, New Jersey, on October 24, 1999. Bennett Grant died as a result of injuries sustained during the assault on March 21, 2000.
Case Investigators also requested that a second test be conducted regarding the truthfulness of the statement Violet Arias gave earlier on this date (September 4, 2001) to the Prosecutor's Office.
Within the confines of these parameters, Detective Gauthier administered two separate polygraph tests to Arias, containing the following sets of questions:

TEST 1
1. Concerning Bennett Grant, did you hit his head with any object?

*669 2. Concerning Bennett Grant, did you hit his head with your foot?
3. Concerning Bennett Grant, did you ever hit his head?

TEST 2
1. Concerning the statement you gave today, did you tell the truth?
2. Concerning the statement you gave today, was it a truthful one?
3. Concerning the statement you gave today, were you being truthful?
Based on his review of the results, Gauthier concluded that Arias was being "deceptive during her polygraph examination." Specifically, Gauthier opined that Arias was not being truthful about the extent of her involvement in the attack.
When she was informed of the results of the polygraph test later that same day, Arias gave a third statement. This time, she admitted kicking Grant in the head. Arias continued to deny that she had an object in her hand during the assault, even though Gauthier found her polygraph answer on this question deceptive.
Thereafter, Arias entered into a plea agreement wherein she pled guilty to one count of reckless manslaughter, with a sentence recommendation of seven years imprisonment, with an eighty-five percent period of parole ineligibility pursuant to NERA. The agreement was expressly conditioned upon Arias providing "truthful testimony" against her codefendants. According to the assistant prosecutor who appeared for the State at the plea hearing, the phrase "truthful testimony" was defined in the plea agreement as testimony consistent with two formal statements Arias made, one preceding the administration of the polygraph test, and one immediately thereafter.

B
At trial, counsel for each defendant moved to cross-examine Arias regarding the results of the stipulated polygraph examination and to offer evidence of the results of the test by calling Gauthier as a defense witness. Alternatively, counsel argued that the State should be precluded from calling Arias as a witness, because Gauthier considered her statement that she did not have an object in her possession when she assaulted Grant "deceptive." Thus, under the defense's argument, by permitting the assistant prosecutor to call Arias as a witness, the court would be facilitating the commission of an ethical violation.[3]
The trial court rejected the defense's argument, noting that counsel were free to impeach Arias's credibility by questioning her about the various versions of events she gave to law enforcement investigators. Although the court acknowledged that the polygraph evidence was "very probative," it nonetheless ruled that defendants could not, as a matter of law, introduce this evidence by invoking the stipulation of admissibility between the State and Arias, because the three defendants on trial were not parties to that contract.
In the course of her direct examination testimony, Arias admitted that her first two statements to authorities were not truthful. In response to the prosecutor's question as to why she had given a third statement on the evening of September 4, Arias declared that she did so because she "was very scared and confused and I just wanted to be truthful and honest because I don't want to live with the lie no more."
Arias's proffered explanation for this material modification of her previous statement *670 prompted an immediate objection from D'Amico's counsel, which in turn triggered the following sidebar discussion between counsel and the court:
[D'AMICO'S ATTORNEY]: The Prosecutor's question to Miss Violet Arias about, "Why did you give this new  final statement"? In response she said, "I couldn't live with the lie anymore. I couldn't live with the lie." I think that is so outrageous, that answer, in light of what transpired. She was confronted with the fact that she lied in a polygraph and then she tells this jury  it almost sounds like she decided to come forward with the truth because, "I couldn't live with the lie anymore." Judge, how in the world could I ever cross-examine that?
THE COURT: I'll tell you exactly how you could do it, because I was thinking about that when she said it. The way you could do it is say to her, "Wasn't it true that the Prosecutor confronted you with other information about your lying and you realized you were finally going to tell the truth because you know your plea agreement was in jeopardy and you knew you faced life with 30 if you didn't tell the truth?"
[D'AMICO'S ATTORNEY]: That's only half of it, Judge.
THE COURT: You asked me to tell you how you could do it. I just told you how you could do it. I'm not changing my ruling. That polygraph is not admissible.
[D'AMICO'S ATTORNEY]: I understand that, Judge, but the Prosecutor should not have elicited the answer that makes it look like she was coming forth out of the goodness of her heart to no longer tell a lie. It's one thing to say I was confronted with evidence 
THE COURT: [T]he bottom line is she didn't come forward with the truth because she flunked the polygraph. She came forward with the truth because she was going to lose her plea agreement. That is why she came forward.
[D'AMICO'S ATTORNEY]: Wrong.
THE COURT: I disagree with you.
[D'AMICO'S ATTORNEY]: If she flunked the polygraph her manslaughter deal was still on the table.
THE COURT: No it wasn't, because I'm telling you it wasn't because it was represented to me  what was required was discussed at the time the plea was taken that she had to take a polygraph and pass the polygraph and if not the offer was off the table. That was the deal. I'm telling you.
[CASTAGNA'S ATTORNEY]: Judge, she didn't plead before the polygraph.
THE COURT: That is exactly my point. This was all discussed with me in chambers. It was discussed not only with her [], it was discussed with Mr. Palumbo and nobody wanted to submit to polygraphs and I said, my words to all the defense attorneys who were interested in pleading, we discussed the potential to the plea. I told them what I needed for a factual basis under the NERA, not what I needed, but what the NERA requires if that was going to be a plea. They would have to, in contemplation of an agg[ravated] manslaughter, excuse me, a manslaughter, what they would have to say, that was number one.
Number two, the State insisted that they had to take the polygraph and pass the polygraph. If they didn't they would not get the plea offer. That was my understanding.
[D'AMICO'S ATTORNEY]: Well I didn't 
[CASTAGNA'S ATTORNEY]: Edward Gentile took a polygraph.

*671 [D'AMICO'S ATTORNEY]: That is not the issue, now. My understanding is, now, when she submitted to the polygraph if she passed it she would have got a non-NERA case.
THE COURT: No.
[PROSECUTOR]: She was getting  there was no offer actually on the table. I was contemplating giving her an agg[ravated] assault plea if she could pass the polygraph, which she didn't, and then her plea offer went up to manslaughter.
[CASTAGNA'S ATTORNEY]: Right.
[PROSECUTOR]: I don't remember whether it was non-NERA or not.
THE COURT: I could tell you there were no non-NERA pleas, because I spoke to Mr. Manahan about this and he insisted once  who plead first?
[CASTAGNA'S ATTORNEY]: Alvin Baez.
THE COURT: Once Alvin Baez plead nobody would get a non-NERA. That was the position of the Prosecutor's Office on that day.
[D'AMICO'S ATTORNEY]: I understand you rulings. This is, with all due respect, unlike tiptoeing around the tulips here and it's just so unfair, it really is unfair.
When D'Amico's counsel cross-examined Arias, she reaffirmed her earlier testimony concerning the reasons for changes in her statements to the police. She acknowledged, however, that she told prosecutors the truth about kicking Grant in the head because "two or three hours later [she was] confronted by the Prosecutor's Office with evidence that [she was] lying."
During cross-examination by Castagna's counsel, Arias admitted that she had lied in her first statement because she did not want to be arrested and charged with being the woman who had assaulted Grant with the pipe. As to her second statement, she admitted that she lied in order to get a more favorable plea agreement. As part of its instructions to the jury, the court gave a "false in one, false in all" charge, specifically naming Arias and others, as part of his general charge on credibility of the witnesses.

C
We will begin our analysis by tracing how the admissibility of polygraph evidence has been historically viewed by the courts. The last time we addressed this issue in a published opinion was in 1989, in the case of State v. Reyes, 237 N.J.Super. 250, 567 A.2d 287 (App.Div.1989). The State in Reyes entered into a stipulation of admissibility with an un-counseled defendant, and then introduced the unfavorable polygraph test results at trial as substantive evidence of culpability. Id. at 262, 567 A.2d at 293. On appeal, the defendant in Reyes challenged the admissibility of the test results as a violation of his Sixth Amendment right to counsel. Ibid. In the course of rejecting defendant's argument, we noted that:
[i]t is now well established that the only way to admit as evidence the results of a polygraph examination is for the State and the defendant to enter into a stipulation. Generally, the stipulation will be honored. The stipulation must, however, be clear, unequivocal and complete.
[Ibid. (citation omitted).]
The stipulation exception to non-admissibility was first established by the Supreme Court thirty-three years ago in State v. McDavitt, 62 N.J. 36, 297 A.2d 849 (1972). The Court recognized "that polygraph testing has been developed to such a point of reliability that in a criminal case when the State and defendant enter into a stipulation to have defendant submit to a polygraph test, and have the results introduced *672 in evidence, such stipulation should be given effect." Id. at 46, 297 A.2d at 854-55. Ten years later, in State v. Carter, 91 N.J. 86, 116, 449 A.2d 1280, 1296 (1982), the Court reaffirmed this threshold admissibility requirement.
Despite the great technological advances made in the three decades since McDavitt was decided, the legal issues surrounding the admissibility of polygraph test results, absent a stipulation by the parties, remain unsettled. See U.S. v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). One thing is clear, however, until our Supreme Court says otherwise, the only way to bring directly before a jury the results of a polygraph test is for the parties to stipulate to its admissibility.
The facts here raised a question that has not been addressed in any published decision in this State: can a defendant cross-examine a State's witness on the results of a polygraph test, where the stipulation of admissibility is only between the witness and the State? We conclude that the answer is "yes." A correct resolution of this question requires that it be framed in the context of the constitutional concerns attendant a criminal trial. The trial court's analysis here was predicated upon an examination of the question through an application of contract law principles of privity.
Defendants' Sixth Amendment right to confront the witnesses against them is best exercised through vigorous cross-examination. Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974); State v. Branch, 182 N.J. 338, 348, 865 A.2d 673, 678-79 (2005). The right of the accused to confront the witnesses' against him or her through cross-examination, is deemed one of the fundamental freedoms secured by the Bill of Rights, Kirby v. United States, 174 U.S. 47, 55-56, 19 S.Ct. 574, 577, 43 L.Ed. 890, 893-94 (1899), and an indispensable component of a fair trial, Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); State v. Garron, 177 N.J. 147, 169, 827 A.2d 243, 256 (2003), cert. denied sub nom., New Jersey v. Garron, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004).
In our adversarial system, cross-examination is often used to probe a witness's testimony in order to (1) identify inconsistencies; (2) bring to the jury's attention any plausible grounds for bias in favor of the witness's proponent or against the cross-examiner's client; and (3) develop and exploit, within the framework of the lawyer's ethical obligations, any other avenue that undermines the witness's credibility.
Here, it is beyond dispute that the results of the polygraph test directly undermine Arias's overall credibility and casts a shadow of doubt over a material area of her testimony; to wit, whether and to what extent she was involved in striking the victim with a metal pipe. The magnitude of the prejudice caused by the exclusion of this evidence can best be appreciated when considered in the context of the jury's fact-finding function. Based on the court's "false in one, false in all" charge, the jury was entitled to disregard Arias's entire account of events if it found any material aspect of her testimony to be false or otherwise not worthy of belief. Although Arias was aggressively cross-examined on the various statements she gave to law enforcement investigators, the trial court's ruling arguably deprived defendants of one of the most potent impeachment weapons available.
Having concluded that this polygraph evidence would have been an important part of an effective cross-examination, *673 we will now turn our attention to the question of admissibility. The State's stipulation of admissibility of Arias's test results constitute more than a contractual relationship between the stipulating parties. The stipulation represents the State's affirmative acceptance of the test results as a trustworthy indicator of the witness's credibility or lack thereof. It also operates as a waiver of any objections the State could have made based on the scientific unreliability of the polygraph.
In implicit recognition of this preclusive effect, the State here assumed complete control over the test's procedures. The State selected the individual who administered the test and chose the topic and format of the questions that were submitted to the witness. Under these circumstances, once Arias took the stand as a witness for the prosecution, defendants' constitutional right of confrontation transformed the results of her State-administered polygraph test into a proper subject of defense counsels' cross-examination.
Independent of these constitutional concerns, we are satisfied that permitting the State to disavow the results of Arias's polygraph test, by limiting the scope of the stipulation's applicability to exclude these defendants, would violate basic notions of fundamental fairness. As that doctrine has evolved, fundamental fairness is invoked to protect a citizen against the unjust and arbitrary actions of the State. In re Sportsman's Firearms License, 374 N.J.Super. 565, 580, 866 A.2d 195, 204 (App.Div.2005).
Here, the State's position, agreeing to the admission of the polygraph test results against Arias if she had gone to trial, but objecting to the admission of the same test results when she is called as a State's witness, is, in our view, disingenuous and inordinately driven by a seeming desire to gain a tactical advantage in this contest. While we recognize that a prosecutor operates in the same adversarial environment as defense counsel, a prosecutor's function is not to win the case, but to insure that justice be done. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935); State v. Rose, 112 N.J. 454, 509, 548 A.2d 1058, 1085-86 (1988).
Having said this, we do not fault the assistant prosecutors who tried these emotionally difficult, legally complex cases, for the strategic decisions made by their office. It is essential to emphasize, however, that the need to scrupulously adhere to constitutional principles and basic notions of fairness is never as important as when it is challenged by emotionally difficult cases.

V

Passion/Provocation Charge as to Morales
For the first time on appeal, Morales contends that the trial court committed reversible error by not sua sponte charging the jury on passion/provocation manslaughter, in light of testimony that the victim had violently attacked Castagna and Arias, both friends of Morales. We agree.
While discussing charging the jury on the offenses of murder, aggravated manslaughter and reckless manslaughter, the trial judge remarked that "in this case there is only reckless manslaughter or manslaughter as a lesser included offense," and that "passion/provocation is not in this case." None of the defendants objected or requested that the jury be charged as to passion/provocation manslaughter. We therefore review Morales's argument under the plain error standard. State v. Bzura, 261 N.J.Super. 602, 616, 619 A.2d 647, 655 (App.Div.), certif. denied, 133 N.J. 443, 627 A.2d 1147 (1993).
*674 Plain error will result in a reversal only if it is "clearly capable of producing an unjust result." R. 2:10-2. Reversal will occur only "if the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1, 7 (1971).
A trial court is obligated to instruct a jury with respect to a lesser included offense when there is a rational basis to do so. State v. Crisantos (Arriagas), 102 N.J. 265, 273-75, 508 A.2d 167, 171-72 (1986); N.J.S.A. 2C:1-8(e). This "rational basis" test has been construed as a low threshold, especially for the passion/provocation manslaughter charge. State v. Erazo, 126 N.J. 112, 123, 594 A.2d 232, 237 (1991). See State v. Copling, 326 N.J.Super. 417, 429, 741 A.2d 624, 631 (App.Div.1999) ("[t]he threshold for a jury instruction for passion-provocation manslaughter is relatively low"), certif. denied, 164 N.J. 189, 752 A.2d 1290 (2000). Indeed, if the evidence in the record supports an instruction on passion/provocation manslaughter, the charge should be given whether or not it is consistent with the defense's theory. State v. Robinson, 136 N.J. 476, 490, 643 A.2d 591, 598 (1994); State v. Powell, 84 N.J. 305, 317, 419 A.2d 406, 412 (1980), certif. denied, 87 N.J. 332, 434 A.2d 81 (1981).
However, as noted in State v. Choice, 98 N.J. 295, 299, 486 A.2d 833, 835 (1985), when defendant did not request a manslaughter charge at trial and contends on appeal, as plain error, that manslaughter should have been charged sua sponte:
[t]he trial court does not, by virtue of [State v. Powell, 84 N.J. 305, 318, 419 A.2d 406, 413 (1980),] have the obligation on its own meticulously to sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge. It is only when the facts "clearly indicate" the appropriateness of that charge that the duty of the trial court arises.
Criminal homicide constitutes manslaughter when: "A homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3 is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). This mitigating element is only available, however, when the killing occurs before sufficient time has passed for an ordinary person in similar circumstances to have cooled off. Crisantos, supra, 102 N.J. at 274-81, 508 A.2d at 171-76; State v. Viera, 346 N.J.Super. 198, 212, 787 A.2d 256, 264 (App.Div.2001), certif. denied, 174 N.J. 38, 803 A.2d 634 (2002).
Passion/provocation manslaughter has four specific elements: (1) reasonable and adequate provocation; (2) insufficient cooling-off time; (3) actual passion caused by the provocation; and (4) no actual cooling off. State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879, 883 (1990). The first two criteria are objective. Viera, supra, 346 N.J.Super. at 212, 787 A.2d at 264. That is, both the adequacy of the provocation and the lack of time to cool off must be judged against the standard of a reasonable person in the defendant's position. The last two elements are subjective. Ibid. That is, if a reasonable person would have been provoked but the defendant was not, the passion/provocation defense will not be available. Thus, because of the objective nature of the first two elements, if they are supported by the evidence, a court must instruct the jury on the lesser-included offense. State v. Josephs, 174 N.J. 44, 103, 803 A.2d 1074, 1109 (2002).
With respect to the first element, "the judge must determine whether a reasonable fact-finder could conclude *675 that the loss of self control was a reasonable reaction." Viera, supra, 346 N.J.Super. at 212, 787 A.2d at 264. Moreover, a trial judge "should view the situation in the light most favorable to the defendant" when deciding whether to instruct a jury on passion/provocation manslaughter. Mauricio, supra, 117 N.J. at 412, 568 A.2d at 884. "If no jury could rationally conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person, the trial court should withhold the charge." Ibid.
It is clear that words alone, no matter how offensive or insulting, never constitute sufficient provocation. Crisantos, supra, 102 N.J. at 274, 508 A.2d at 171-72. Nor would a "bump" and "insulting language," State v. King, 37 N.J. 285, 290, 301-02, 181 A.2d 158, 167 (1962), in the absence of a severe battery, constitute sufficient provocation. Mauricio, supra, 117 N.J. at 413-14, 568 A.2d at 884. However, mutual combat, under certain circumstances, could constitute adequate provocation to reduce murder to manslaughter. Ibid.
It is also well settled that a person can be provoked by conduct that causes injury to a relative or close friend. State v. Coyle, 119 N.J. 194, 225-27, 574 A.2d 951, 966-68 (1990); Copling, supra, 326 N.J.Super. at 429-30, 741 A.2d at 631. This type of provocation need not be witnessed by the accused, provided that he or she is informed of the actual event. Coyle, supra, 119 N.J. at 226, 574 A.2d at 967; Copling, supra, 326 N.J.Super. at 429-30, 741 A.2d at 631.
Here, Morales argues that the trial court should have charged passion/provocation manslaughter because, viewing the evidence in the light most favorable to the defense, this case involved a group of people, including Morales, who had responded to Grant's "violent attack" upon Arias, who fell against the cigarette machine in the bar when Grant hit her, and upon Castagna, who fell like "a sack of potatoes" in the street in front of the bar when Grant struck her.
The record supports Morales's position. There was evidence presented from which a jury could find that Morales was told about Grant assaulting these two women. From this there is a rational basis to conclude that there was no opportunity for a reasonable person in Morales's position to have cooled off.
As Grant ran for his life, the evidence shows that the mob reached a state of frenzy. Once it reached the victim, the mob mercilessly beat and kicked the helpless Grant, as he attempted to shield himself from the blows. Under these circumstances, a rational jury could have found that Morales, as one of those caught up in these events, did not have an opportunity to cool off. It is also the jury's function to determine whether Morales's attack against Grant was a response proportionate to the force allegedly used against Arias and Castagna.

VI

Ineffective Assistance of Counsel as to D'Amico
D'Amico contends that he received ineffective assistance of counsel when, during his opening statements, his trial counsel called him a "criminal," told jurors that he was "guilty," and promised jurors that he would testify in his own defense. D'Amico also argues that his counsel was ineffective when he failed to object to the State's request that he demonstrate for the jury, by kicking the hollow witness-stand stair, the alleged manner in which he kicked Grant. We agree, in part, with D'Amico's argument and are therefore *676 compelled to reverse his convictions on this legal ground.
We begin our analysis by reaffirming what has long been the judicial policy of this State. Ineffective assistance of counsel claims ordinarily depend upon allegations and evidence which lie outside the record and are thus disfavored on direct appeal. State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280, 1285 (1992); State v. Swint, 328 N.J.Super. 236, 262, 745 A.2d 570, 585 (App.Div.), certif. denied, 165 N.J. 492, 758 A.2d 651 (2000); State v. Loftin, 287 N.J.Super. 76, 110, 670 A.2d 557, 574 (App.Div.), certif. denied, 144 N.J. 175, 675 A.2d 1123 (1996). Direct appellate review is only appropriate when the trial record discloses all of the essential facts supporting defendant's claims. State v. Allah, 170 N.J. 269, 285, 787 A.2d 887, 896 (2002). We are satisfied that the record before us contains sufficient facts to support defendant's claims.
A defendant alleging ineffective assistance of counsel must establish that his "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692-93 (1984). In State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987), our Supreme Court adopted the Strickland standard, that "a defendant whose counsel performed below a level of reasonable competence must show that `there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 60-61, 519 A.2d at 346 (quoting Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698).
Thus, to establish a prima facie claim of ineffective assistance of counsel, defendant must meet both prongs of the Strickland/ Fritz test. First, he must show that the actions of his trial counsel were deficient in performance and not objectively reasonable. Second, defendant must show that this deficient performance materially affected the outcome of his trial. In determining whether defendant has met the first prong of the Strickland/Fritz test, an appellate court will not second-guess defense counsel's trial decisions which rest upon strategic or tactical considerations. Estelle v. Williams, 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126, 135 (1976); State v. Buonadonna, 122 N.J. 22, 38, 583 A.2d 747, 755 (1991).
Our Supreme Court has long recognized that in certain "rare instances" counsel's trial mistakes can be of such magnitude "as to thwart the fundamental guarantee of [a] fair trial." State v. Dennis, 43 N.J. 418, 428, 204 A.2d 868, 873 (1964). We believe that defense counsel's trial errors, as evidenced by his remarks to the jury, rise to this constitutionally impermissible level.
D'Amico's trial counsel made the following remarks in the course of his opening statement to the jury:
But the bottom line is, and it's not easy to say it, my client is a criminal. He dishonored the badge. You are going to find him guilty of probably one or maybe two counts of misconduct and of obstruction of justice. My client is going to testify that he assaulted Bennett Grant. He kicked him. He didn't stomp him. He didn't cause his death. We'll talk about that later. He kicked him once in the back of the leg or by his butt. He's done as a police officer. He's done as a citizen. He's a criminal. He is going to get on the stand and take responsibility for his acts. You will judge what crimes he is guilty of. So you can forget about the presumption of *677 innocence or the assumption of innocence on the misconduct because he is guilty of which count you will determine or which counts, maybe even multiple counts.
[Emphasis added.]
Also as part of his opening statement, D'Amico's counsel advised the jury that his client was part of the mob who chased down Grant "for the purpose of assaulting him." Notwithstanding this remarkable concession, counsel further indicated that D'Amico would take the stand as a witness and admit kicking Grant, but deny that his purpose in doing so was to cause his death or inflict serious bodily injury.
In order to fully appreciate the prejudice caused by these remarks, we must consider them in the context of the charges against D'Amico. In addition to the homicide charges involving murder and aggravated manslaughter, D'Amico was also charged, as a police officer, with two counts of second-degree official misconduct and one count of fourth-degree obstruction of a law enforcement investigation. Thus, defense counsel's opening statements to the jury conceded D'Amico's guilt as to all of the charges involving his status as a police officer.
The damage does not end here. In addition to leaving his client exposed to significant penal consequences, counsel's highly inflammatory, unequivocally prejudicial characterization of D'Amico as a "criminal" whose life as both a "police officer" and a "citizen" was over, could have only served to critically undermine D'Amico's credibility as a witness in his own defense. Stated differently, it seems obvious to us that a rational juror would look with distrusting eyes upon a witness whose own lawyer has labeled him criminal and a disgrace to his position as a police officer. These attacks on D'Amico's character served only to weaken counsel's defense strategy of persuading the jury that his client's admittedly criminal conduct did not cause Grant's death.
Once D'Amico took the stand as a witness, counsel made good on his opening statement promises to the jury, by eliciting from his client the following key concessions: (1) D'Amico, along with rest of the mob, ran after Grant, as the latter attempted to escape from his pursuers; (2) this chase included pursuing Grant as he jumped over a fence in a futile effort to elude his attackers; and (3) once they reached the hapless Grant, D'Amico and the rest of the mob began kicking him as he laid on the ground. Counsel attempted to counteract the damage caused by these highly prejudicial admissions by soliciting from D'Amico a series of self-serving declarations. The futility of this ill-conceived strategy is made apparent in the following excerpt from D'Amico's direct examination testimony:
Q. What do you do?
A. I ran up and I kicked him.
Q. Why did you kick him?
A. I was mad, I was pissed. He just hit my friend's sister. I was drinking, but, you know, that is no excuse for what I did.
Q. How many times did you kick him?
A. Two times.
Q. What part of Mr. Grant's body did you kick?
A. His lower back. Possibly his butt, his legs.
Q. Could you have kicked him three times?
A. I could have. I really didn't  I could have.
Q. Could you have kicked him eight or nine or ten times?
A. Absolutely not.

*678 Q. What was your intent, what was your purpose when you kicked him?
A. It was just a stupid reaction, just stupid.
Q. Did you intend to hurt him?
A. Yes.
Q. Did you intend to cause serious bodily injury?
A. No.
Q. Were you debating in your mind what you should do and how hard should this kick be?
A. No.
Q. Had you had any discussions with anybody else around him as to what your purpose was?
A. No.
Q. Did you say anything to anybody else in the group?
A. No.
Q. Did you see where the other people were kicking Mr. Grant?
A. They were  everybody was just kicking him all over.
Q. What was Mr. Grant doing?
A. Shuffling back and forth with his hands up from the floor.
THE COURT: Witness pulled his elbows up by his chest, put his hands, fists clenched in front of his face.
Q. Did you think that these people could seriously hurt him?
A. I didn't know what anybody else intended to do. I just  it just happened so fast. I just knew what I did. I knew I kicked him.
We must make clear, however, that we do not view this situation as equivalent to the case of a lawyer and a client who knowingly adopt a high-risk strategy, designed and intended to juxtapose a negative against a positive, (the so-called "I may be a corrupt cop who kicked this helpless victim, but I'm no killer" defense), thereby theoretically enhancing a defendant's credibility on the central issue in the case. In such a situation, which is akin to invited error, State v. Jenkins, 178 N.J. 347, 359, 840 A.2d 242, 249 (2004), we will not rescue a defendant from the negative, but otherwise reasonably foreseeable consequences, of pursuing such a "go for broke" strategy.
Here, by contrast, in conceding that D'Amico chased Grant as part of the mob, and with the expressed purpose of kicking him, counsel linked his client to the aggregate violence perpetrated by the assaulting mob, thereby assisting the State in establishing the principal part of its theory of causation: that Grant's death was caused by the cumulative effect of the blows he received. Counsel's remarks, as an introduction of his ill-conceived overall defense plan, served only to cast his client in the negative light of criminality, without the commensurate positive result ordinarily created by the juxtaposition.

VII

Conclusion
Defendants Castagna's, Morales's and D'Amico's convictions are reversed for the reasons stated herein, and their cases are remanded for a new trial. The remaining arguments raised by defendants in their respective briefs lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).
Reversed and remanded.
NOTES
[1] These appeals, originally calendared back-to-back, are consolidated on the court's motion for purposes of opinion only.
[2] Because he was the first to reach an agreement with the State, Baez's plea agreement specifically provided for a non-NERA sentence.
[3] Pursuant to a lawyer's obligation of candor toward a tribunal, a lawyer "may refuse to offer evidence that the lawyer reasonably believes is false." R.P.C. 3.3(c).