873 A.2d 630 (2005)
377 N.J. Super. 515
STATE of New Jersey, Plaintiff-Respondent,
v.
Keith R. DOMICZ, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 2, 2005.
Decided May 23, 2005.
*633 Yvonne Smith Segars, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, of counsel and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Leslie-Ann M. Justus, Deputy Attorney General, of counsel and on the brief).
Before Judges FALL, PAYNE and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
Defendant appeals the denial of his motion to suppress evidence gathered by police during a purported consent search of his home  a search preceded by a warrantless thermal scan of that home and a warrantless search of a power company's records of the use of electricity there. Because the trial judge mistakenly failed to *634 recognize the illegality of the prior searches or weigh their impact on the later search of the same premises, and because the trial judge erroneously excluded polygraph evidence regarding the truthfulness of defendant's claim that he did not consent to the later search, we reverse.

I
Defendant was charged with first-degree maintaining or operating a controlled dangerous substance (CDS) production facility (marijuana in an amount greater than ten plants), in violation of N.J.S.A. 2C:35-4; first-degree possession with intent to distribute CDS (marijuana in an amount greater than fifty plants), in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(10)(a); fourth-degree possession of CDS (marijuana in an amount greater than fifty grams), in violation of N.J.S.A. 2C:35-10(a)(3); and third-degree possession of CDS (methamphetamine), in violation of N.J.S.A. 2C:35-10(a)(1).
After the trial judge denied his motion to suppress, defendant entered a plea of guilty to first-degree maintaining or operating a CDS production facility. The trial judge imposed a sentence of ten years' imprisonment, one-third of which defendant must serve before becoming eligible for parole. Monetary assessments were also imposed. Pursuant to the plea agreement, the other counts of the indictment were dismissed.
Defendant filed this appeal,[1] raising the following arguments:
DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE SHOULD HAVE BEEN GRANTED BECAUSE THE POLICE ENTRY INTO DEFENDANT'S HOME AND THE SEARCH OF HIS HOME VIOLATED THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.
A. The Warrantless Thermal-Imaging Scan Of Defendant's Home Constituted An Unreasonable Search.
B. The Warrantless Seizure Of Defendant's Electric Bills Was Illegal.
C. Defendant's Consent to Search His Home Was Not Voluntarily And Knowingly Made.
In a supplemental brief, filed with our permission, defendant also raised the following argument:
THE LOWER COURT ERRED BY EXCLUDING POLYGRAPH EVIDENCE THAT DEFENDANT DID NOT PROVIDE CONSENT FOR THE DETECTIVES TO SEARCH HIS RESIDENCE; THEREFORE, THE DENIAL OF HIS MOTION TO SUPPRESS THE EVIDENCE MUST BE REVERSED.
We agree that the warrantless thermal-imaging scan of defendant's Williamstown home and the warrantless seizure of utility records regarding the amount of electricity consumed in defendant's home were illegal. As a result, we reverse the judgment of conviction, vacate the denial of the motion to suppress, and remand for consideration, after a hearing, of whether defendant consented to the search of his home and, if so, whether the consent search was so impacted by the prior unlawful police conduct as to require the exclusion of the evidence then seized. We also conclude that the trial judge erred by failing to allow testimony about a polygraph test administered to defendant. And we lastly direct that a different judge be assigned to *635 conduct all future proceedings in the trial court.

II
Defendant moved for the suppression of evidence obtained from his home on July 27, 2000. The State asserted that defendant consented to the search.
The record created at the suppression hearing revealed that, in January 2000, Detective William Peacock, lead investigator for the New Jersey State Police's Marijuana Eradication Unit, obtained information by way of subpoena that defendant had received four packages of indeterminate size and content from a nearby business that sells plant growth equipment. Why a subpoena was sought to obtain these records was not revealed at the suppression hearing.
Defendant's mere receipt of this equipment  the precise nature of which has not been revealed  led Detective Peacock to somehow suspect that defendant might be growing marijuana in his home. As a result, Detective Peacock obtained a subpoena to compel a power company to turn over records concerning defendant's residential use of electricity. The record, however, does not disclose what this information revealed. Instead, during the suppression hearing, the assistant prosecutor posed only the following questions to Detective Peacock regarding this information:
Q. Did your suspicions stem from anything else aside from the packages [of plant growth equipment] being delivered to [defendant's home]?
A. After the packages were delivered we subpoenaed the electrical usage of his residence and two comparable houses.
Q. And what was the purpose of that generally?
A. Generally to see how much electricity he was using compared to those other residences.
Q. And why did you do that and what would it tell you?
A. It would tell us if the equipment that was delivered to that residence was being used because the electrical consumption would go up.
Q. And why is that?
A. Because the specialized grow[th] equipment uses a lot of electricity.
The assistant prosecutor never asked Detective Peacock what his comparison revealed.
On cross-examination, defense counsel sought to explore the content of these electrical records as well as the manner in which they were obtained. He was permitted only a few questions before the trial judge ruled that this information had no bearing on whether defendant voluntarily consented to a search of his home. Other than his earlier examination that confirmed Detective Peacock had obtained the electrical usage records without a search warrant, the following constitutes the entirety of defense counsel's cross-examination in this area, as well as the judge's rulings that precluded further inquiry:
Q. And you said that you compared his electrical records to other houses nearby?
A. Correct.
Q. How many residents were in these other houses?
A. I don't know?
Q. Did you talk to the other occupants of the other houses?
A. No.
. . . .
Q. So when you compared [defendant's] electrical records to these other houses, you didn't know how many occupants *636 or whether there were even any occupants there; is that correct?
A. These two other houses were occupied, I just don't know by how many people.
Q. Or how often they stayed there?
A. Nor did I know about ... how many people resided [in defendant's home] either.
Q. That's correct. But with respect to the other houses you didn't know how many people were there 
THE COURT: Can we get back to the issue of consent.
[DEFENSE COUNSEL]: Okay. Well, the State brought this up. Apparently on direct 
THE COURT: No, they 
[DEFENSE COUNSEL]:  they brought out this issue of comparing these electrical records.
THE COURT: I don't know what that has to do with consent either.
[DEFENSE COUNSEL]: I quite frankly I think it goes to the totality of the circumstances and I'm glad they brought it up.
THE COURT: Yeah, okay.
[THE PROSECUTOR]: Your Honor.
THE COURT: Well, if you want to use that at trial, that's okay but let's get onto the issue of consent.
Defense counsel, in compliance with the trial judge's directive, asked no further questions regarding the electrical usage records.
As a result, the record reflects that when deciding to seek defendant's consent to a search of his home, Detective Peacock knew only that defendant obtained equipment, only identified as plant growth equipment, in January 2000; that no unusual amount of heat emanated from defendant's home when a warrantless thermal scan was conducted in May 2000[2]; and that subpoenaed utility records indicated that defendant's home used electricity to some unknown extent at some unknown time. Detective Peacock conceded that this information would not support the issuance of a search warrant for defendant's home, but he felt it appropriate to speak to defendant. Consequently, Detective Peacock determined to engage defendant in a "knock and talk."
On July 27, 2000, Detective Peacock approached defendant's residence, in the early morning,[3] with four other law enforcement agents, all in plain clothes and all armed. They entered the curtilage of defendant's home, without consent. In fact, two officers passed through a gate that had been closed to approach the back door, while the other three officers approached the front door, as Detective Peacock described:
Q.... [I]t's a small house; is that correct?
A. Yes.
Q. So when you went up to this small house, three officers went to the front and two officers went to this rear door, is that what you've shared with us?
A. Yes.
Q. Did anybody invite you to the rear door?
A. No.
Q. Had you called [defendant] in advance to ask him if you could go on his *637 property to the point of going to the rear door?
A. No.
Q. You had to go through a gate to get to the rear door; is that correct?
A. Correct.
Q. You didn't ask his permission to go through the gate?
A. No.
Detective Peacock acknowledged that the manner in which the officers approached to engage in this "knock and talk" was compatible with how a search warrant would have been executed, the only difference being that the officers did not have a search warrant and would not have obtained a search warrant, from an impartial judge, if sought.
In addition, contrary to Detective Peacock's testimony that he simply wanted to talk to defendant, the officer at the front door did not merely request that defendant speak with them but instead demanded that defendant speak to them:
Q. And when you first went to the property, I think you characterized Detective DiBiase as being the first to speak to [defendant]?
A. Correct.
Q. He didn't say can we speak to you?

A. No.

Q. He said we need to speak to you?

A. Yes.

[Emphasis added.]
Detective Peacock testified that all five officers then entered defendant's home through the front door and that he obtained defendant's consent, as memorialized on a consent form that defendant executed. Once in the home, according to Detective Peacock, defendant readily divulged that there were forty marijuana plants growing in the basement. The officers' subsequent search led to the discovery of over one hundred growing marijuana plants in various parts of defendant's home as well as numerous plastic bags containing processed marijuana, and a plastic bag containing methamphetamine.
Defendant disputed Detective Peacock's version, testifying at the suppression hearing that Detective DeBiase knocked on his front door, said he had a search warrant, and promptly entered the home through the front door with two other officers.[4] The officers inside then let Detective Peacock and the fifth officer in through the back door. According to defendant, no one asked his permission to enter or search the home, but, instead, immediately upon entering, an officer handcuffed defendant and told him to sit on a couch in the living room, along with his girlfriend, while the officers searched the home. Only approximately one hour later was defendant asked to sign a form (the aforementioned consent form) that he was not permitted to read. Defendant testified that, when presented to him, the consent form was folded in such a way as to preclude his ability to read its contents, an issue that was explored at the hearing, when it was revealed through the testimony of a retired state police officer that the consent form in question was outdated.
In addition, defendant called a polygrapher to testify. Prior to his being sworn, the trial judge sustained the State's objection, thus precluding the polygrapher's testimony regarding the results of his examination of defendant relating to the July 27, 2000 events. Defendant also offered the polygrapher's testimony of prior consistent statements allegedly made by defendant, which the trial judge initially permitted; however, the trial judge soon thereafter sustained the State's objection that such *638 testimony was barred by N.J.R.E. 607, a ruling defendant has not challenged on appeal.
The trial judge found Detective Peacock's version credible. He rejected defendant's argument that the consent form was folded in a way that, when presented for his signature, barred his examination of its content; found insignificant that the consent form was outdated; found Detective Peacock credibly explained why so many officers were present when the ostensible intent of the visit was to simply "knock and talk"[5]; found reasonable the fact that Detective Peacock passed through a gate, entered defendant's backyard and approached the back door, because the detective believed that was the door more commonly used by the residents[6]; found that defendant invited the officers into his home because it was raining; found that, upon entering the home, Detective Peacock was able to detect the smell of unburnt marijuana; and found that defendant volunteered there were marijuana plants in the basement. From these facts, the trial judge concluded that defendant freely and voluntarily consented to the search of the home, and consequently denied defendant's motion to suppress.
As we have observed, the trial judge precluded defense counsel's inquiries into the legality of the warrantless search of electrical usage records and did not determine whether such a search required a warrant. While defendant attempted to assert that the prior searches were unlawful and tainted the consent allegedly given by defendant to a physical search of his home, the trial judge mistakenly failed to consider or decide those issues.

III
Contrary to the trial judge's ruling, the sufficiency of defendant's alleged consent to the search of his home on July 27, 2000 may very well have been impacted by any prior illegal searches. "The Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution require that police officers obtain a warrant before searching a person's property, unless the search falls within one of the recognized exceptions to the warrant requirement." State v. Cassidy, 179 N.J. 150, 159-60, 843 A.2d 1132 (2004) (citations and internal quotation marks omitted). Our Supreme Court has emphatically cautioned that a warrantless search of a person's home "must be subjected to particularly careful scrutiny, because physical entry of the home is the chief evil" against which these constitutional precepts are directed. Id. at 160, 843 A.2d 1132 (citations and internal quotations omitted); see also United States v. United States Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972); State v. Hutchins, 116 N.J. 457, 463, 561 A.2d 1142 (1989); State v. Bolte, 115 N.J. 579, 584-85, 560 A.2d 644 (1989). As our Supreme Court recently said, "[t]he sanctity of one's home is among our most cherished rights." State v. Frankel, 179 N.J. 586, 611, 847 A.2d 561 (2004).
Here, the State argues that the search of defendant's home was based upon his free and voluntary consent. Defendant, on the other hand  besides disputing the State's version of what occurred in his home on July 27, 2000  contends that the search was tainted by prior illegal searches and seizures. Because, contrary *639 to the trial judge's approach, evidence obtained from a consent search of a home will be excluded if it results, either directly or indirectly from illegal police conduct, we must initially consider whether the officers conducted any prior unlawful searches.

A
The record presents little information  or controversy  regarding the first known step in the investigation of defendant. We know from our review of the record only that Detective Peacock subpoenaed information that defendant purchased plant growth equipment from a business located in Williamstown. The record does not reveal what this equipment consisted of or why its purchase piqued the detective's interest, but there is no dispute that this equipment could be used to grow marijuana plants indoors. It is also conceded that it is lawful to purchase or possess such equipment and that it may be used to grow plants that may be lawfully grown. What prompted the police to compel the turnover of this information regarding defendant's purchase of plant growth equipment is not revealed by the record.
Defendant has not questioned on appeal the lawfulness of the seizure of that evidence.

B
Armed with information that defendant obtained plant growth equipment, Detective Peacock then conducted, without a warrant, a thermal scan of defendant's residence in May 2000.
On June 11, 2001, slightly more than one year later, the Supreme Court of the United States held that thermal scanning constitutes a "search" within the meaning of the Fourth Amendment and that such a search of a home may not be conducted in the absence of a warrant. Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). While the State seeks our imprimatur on this warrantless search  only because Kyllo had yet to be decided when this search occurred  we conclude that the unlawfulness of such a search, even if not previously announced, should have been understood by law enforcement officials in New Jersey. As the Kyllo Court held, thermal scannings of residences represent "the search of the interior of homes  the prototypical and hence most commonly litigated area of protected privacy." Id. at 34, 121 S.Ct. at 2043, 150 L.Ed.2d at 102. The Court based its holding on the fact that there is
a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that exists, and that is acknowledged to be reasonable. To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment.
[Ibid.]
We view Kyllo's holding, even when defendant's home was thermally-scanned a year earlier, to have been predictable, because a warrantless thermal scan unreasonably intrudes into and tends to reveal, albeit in a very general way, what occurs within the interior of the home  the "chief evil" the federal and state constitutions were designed to combat. State v. Cassidy, supra, 179 N.J. at 160, 843 A.2d 1132. While such a scan, in and of itself, may reveal nothing more than the greater emanations of heat from particular areas of a structure, the Fourth Amendment's shield from unreasonable governmental intrusions into the home is not restricted to only those things some would describe as "intimate." Any physical invasion of a home, "by even a fraction of an inch," is too much. Silverman v. United States, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 *640 L.Ed.2d 734, 739 (1961). In relying upon this earlier statement in Silverman, the Court concluded in Kyllo that "all details are intimate details, because the entire area is held safe from prying government eyes." 533 U.S. at 37, 121 S.Ct. at 2045, 150 L.Ed.2d at 104. Propelled by this view of the sanctity of the home, formed by hundreds of years of English and American law, the Court chose not to develop "a jurisprudence specifying which home activities are `intimate' and which are not." Id. at 38-39, 121 S.Ct. at 2045, 150 L.Ed.2d at 105.
As can be seen, the Supreme Court has consistently maintained that technological advances notwithstanding, the Fourth Amendment's warrant requirement is triggered by any search of the home that reveals not only those activities that many would call intimate but also those circumstances hardly likely to be viewed as intimate, such as "the fact that someone left a closet light on." Ibid. See also Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We, thus, conclude that the Court's holding in Kyllo, despite the division within the Court itself, was predictable and we reject as lacking in merit the implication of the State's argument  that Kyllo departed from existing law and should only apply prospectively. See State v. Burstein, 85 N.J. 394, 403, 427 A.2d 525 (1981).
While we also recognize that, prior to Kyllo, a majority of courts had determined that a thermal scan of a structure from a public thoroughfare did not constitute a search,[7] a substantial minority had held to the contrary.[8] Regardless of this imbalance, our courts have interpreted the scope of rights granted by Article I, paragraph 7 of the New Jersey Constitution[9] more broadly than courts have interpreted the Fourth Amendment, as more fully discussed later in this opinion. This expansive quality of Article I, paragraph 7 strongly suggests that those who formulate law enforcement policy in this State would have understood, well in advance of Kyllo, the likelihood that to be lawful a thermal scan of a home, as conducted by Detective Peacock here, would have required the issuance of a search warrant.

C
The thermal scan in May 2000 suggested that no unusual or uncommon amount of "waste heat" was escaping from defendant's home, and, according to the record, Detective Peacock only knew that defendant had purchased lawful plant growth equipment in January 2000. With this limited and innocuous information, Detective *641 Peacock obtained a subpoena to compel the power company's records relating to the usage of electricity in defendant's home as well as other similarly-sized homes for comparison purposes. The State acknowledges that the police did not have probable cause to obtain a warrant for the production of these records, but nevertheless argues that such records are fair game and may be searched and seized regardless of the absence of a warrant based on probable cause because citizens have no legitimate expectation of privacy in such records.
In order for a law enforcement official's conduct to be considered a "search" that implicates the warrant requirements of the Fourth Amendment and Article I, paragraph 7, it must be shown that the accused has a legitimate expectation of privacy in the invaded place that society is prepared to recognize as reasonable. Minnesota v. Olson, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85, 92 (1990); State v. Stott, 171 N.J. 343, 354, 794 A.2d 120 (2002). Defendant argues that the police obtained these electrical usage records in violation of both the federal and state constitutions. We need not resolve the federal question posed because we find that this warrantless search was prohibited by Article I, paragraph 7 of our state constitution.
In considering the reach of legitimate privacy expectations, we again observe that Article I, paragraph 7 has been interpreted more expansively than the Fourth Amendment. Divergent federal and state constitution requirements are not unusual. The federal constitution does not prohibit state constitutions from granting its citizens greater rights than allowed by the Fourth Amendment. Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967).
In broadly interpreting Article I, paragraph 7, New Jersey courts "manifest no disrespect for the nation's highest court but merely honor our `obligation to uphold [our] own constitution.'" State v. Hempele, 120 N.J. 182, 197, 576 A.2d 793 (1990) (quoting Justice Pollock's concurring opinion in State v. Lund, 119 N.J. 35, 38, 573 A.2d 1376 (1990)). Such a departure is often, although not always, based on a particular state interest or local requirement, or other distinctions between the language of the federal and state constitutions, or the preexisting content of state law. See, for example, Justice Handler's concurring opinion in State v. Hunt, 91 N.J. 338, 364-68, 450 A.2d 952 (1982) and Justice Garibaldi's dissenting opinion in State v. Hempele, supra, 120 N.J. at 230-31, 576 A.2d 793. However, we do not regard the absence of these "divergence criteria," expressed primarily in dissenting and concurring opinions, as otherwise requiring that we remain in mute lock-step with the federal constitution.[10] Ultimately, as Justice Brennan said:
[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. *642 State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law  for without it, the full realization of our liberties cannot be guaranteed.
[William J. Brennan, Jr., State Constitutions and the Protections of Individual Rights, 90 Harv.L.Rev. 489, 491 (1977).]
A comparison of the decisions of the Supreme Court of the United States in interpreting the Fourth Amendment and the decisions of our courts in interpreting Article I, paragraph 7, demonstrates that our courts have adhered to Justice Brennan's reminder that "state courts no less than federal are and ought to be the guardians of our liberties." Ibid. In Hempele, Justice Clifford described how this State's judicial officers should certainly consider the guidance provided by the Supreme Court of the United States while, at the same time, not abandon their own conscience and reasoned judgment in honoring the oaths they too have taken:
[A]lthough th[e] [Supreme] Court may be a polestar that guides us as we navigate the New Jersey Constitution, we bear ultimate responsibility for the safe passage of our ship. Our eyes must not be so fixed on that star that we risk the welfare of our passengers on the shoals of constitutional doctrine. In interpreting the New Jersey Constitution, we must look in front of us as well as above us.
. . . .
When the United States Constitution affords our citizens less protection than does the New Jersey Constitution, we have not merely the authority to give full effect to the State protection, we have the duty to do so. Every judicial officer in New Jersey takes an oath to "support the Constitution of this State * * *." N.J.S.A. 41:2A-6. Bound to fulfill our covenant with the people of New Jersey, we must "respectfully part company" with the Supreme Court when we find that it has provided our citizens with "inadequate protection against unreasonable searches and seizures * * *."
[120 N.J. at 196, 576 A.2d 793 (quoting State v. Alston, 88 N.J. 211, 226, 440 A.2d 1311 (1981)).]
In looking above as well as in front of us, and in fulfillment of our obligation to faithfully uphold the state constitution, we conclude that Article I, paragraph 7 protects individuals from warrantless searches of a utility's records regarding the usage of electricity in an individual's home.
In examining this issue, we commence by recognizing, as Justice Sullivan observed, that the wording of Article I, paragraph 7 is "taken almost verbatim from the Fourth Amendment." State v. Johnson, 68 N.J. 349, 353 n. 2, 346 A.2d 66 (1975). Notwithstanding, our courts have recognized that in many instances Article I, paragraph 7 provides greater rights to an accused than the Supreme Court of the United States has found in the Fourth Amendment.
State v. Johnson marks the first step in New Jersey search and seizure jurisprudence beyond the basic rights guaranteed by the Fourth Amendment. Ibid. ("[U]ntil now [Article I, paragraph 7] has not been held to impose higher or different standards than those called for by the Fourth Amendment.") Two years earlier, in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L. Ed.2d 854 (1973), the Court held that knowledge of the right to refuse consent to a search is only one factor in determining the voluntariness of *643 consent. In State v. Johnson, the Court specifically rejected that approach in interpreting Article I, paragraph 7 and held that, in such circumstances, the State has the burden of proving by clear and positive evidence that consent was voluntarily given, including proof that the accused had knowledge of the right to refuse consent. 68 N.J. at 353-54, 346 A.2d 66. See also State v. King, 44 N.J. 346, 352, 209 A.2d 110 (1965); State v. Chapman, 332 N.J.Super. 452, 466, 753 A.2d 1179 (App.Div. 2000).
Since the Supreme Court's 1975 departure from Schneckloth, the scope of Article I, paragraph 7 has been found to expand beyond the parameters of the Fourth Amendment in many instances. Our courts have, for example, determined that the state constitution provides an accused automatic standing to complain of an unlawful search and seizure, compare State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981) (retaining the former federal automatic standing rule) with Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (only those with a reasonable expectation of privacy have Fourth Amendment standing); recognizes a reasonable expectation of privacy in the telephone numbers called by an accused from his telephone, compare State v. Hunt, supra, 91 N.J. 338, 450 A.2d 952, and State v. Mollica, 114 N.J. 329, 554 A.2d 1315 (1989) (holding that the requirements of Hunt also apply to a hotel room telephone used by the accused), with Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); recognizes a reasonable expectation of privacy in the records maintained by a financial institution regarding an accused's bank account, compare State v. McAllister, 366 N.J.Super. 251, 264, 840 A.2d 967 (App.Div.), certif. granted, 180 N.J. 151, 849 A.2d 183 (2004) with United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); recognizes a reasonable expectation of privacy in garbage in opaque containers left at the curb for collection, compare State v. Hempele, 120 N.J. 182, 576 A.2d 793 (1990) with California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); rejects the inclusion of a "good faith" exception to the exclusionary rule, compare State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987) with United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); recognizes a broader concept of seizure than does the Fourth Amendment, compare State v. Tucker, 136 N.J. 158, 642 A.2d 401 (1994) with California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); recognizes that a warrantless arrest for a motor vehicle offense does not authorize the search of a vehicle's passenger compartment, compare State v. Pierce, 136 N.J. 184, 642 A.2d 947 (1994) with New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); recognizes that there must be a reasonable and articulable suspicion of criminal wrongdoing as a prerequisite to requesting consent to search after a routine stop for a motor vehicle violation, compare State v. Carty, 170 N.J. 632, 790 A.2d 903 (2002) with Schneckloth, supra (imposing no such requirement for Fourth Amendment purposes); and recognizes that the State must prove by clear and convincing evidence, and not a mere preponderance of the evidence, that the police would have obtained a search warrant independent of the tainted knowledge or evidence previously obtained, compare State v. Holland, 176 N.J. 344, 823 A.2d 38 (2003); State v. Sugar, 100 N.J. 214, 495 A.2d 90 (1985) with Murray v. United States, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).
Guided by these frequent departures from what the Court in Hempele, *644 supra, 120 N.J. at 197, 576 A.2d 793, referred to as the Fourth Amendment's "floor of constitutional protection"  in guaranteeing, through the application of the state constitution, the full realization of our liberties  we conclude, as a matter of first impression in this State, that there is a legitimate expectation of privacy in electrical usage records maintained by a power company.
In asserting that we should hold otherwise, the State poses three arguments. First, the State urges that there can be no reasonable expectation of privacy in utility records that are created by or are in the possession of a third person. Second, the State contends that these records reveal only information about the amount of "waste heat" emanating from defendant's home and not private, personal or intimate details about what has occurred within. And third, the State asserts that the Supreme Court has found such warrantless searches of utility records to be proper in State v. Jones, 179 N.J. 377, 846 A.2d 569 (2004) and State v. Sullivan, 169 N.J. 204, 777 A.2d 60 (2001). The State's first two points are without merit because, while perhaps justified by some decisions that define the scope of the Fourth Amendment, they misconceive the manner in which our courts have interpreted Article I, paragraph 7. And, as for the third, we conclude that the State has interpreted Jones and Sullivan far more broadly than warranted by the context in which utility records are therein mentioned.
Four other courts have specifically decided the issue, three of which have held there is no legitimate expectation of privacy in such records. See Samson v. State, 919 P.2d 171 (Alaska Ct.App.1996); People v. Dunkin, 888 P.2d 305 (Colo.Ct.App. 1994), cert. denied, sub nom., Smith v. Colorado, 515 U.S. 1105, 115 S.Ct. 2251, 132 L.Ed.2d 259 (1995); State v. Kluss, 125 Idaho 14, 867 P.2d 247 (Ct.App.1993). We are not persuaded by the decisions of these three courts because their determinations were based on either the Fourth Amendment or their own state constitutions, and were generated by an approach we deem inconsistent with the scope of Article I, paragraph 7.[11] Instead, we align *645 our decision with In re Maxfield, 133 Wash.2d 332, 945 P.2d 196 (1997), the only case we are aware of that has found a reasonable expectation of privacy in such records, because Washington's search and seizure jurisprudence is far more akin to our own.

1. Is It Significant that the Electrical Usage Records Were Created and Maintained By a Third Party?
The fact that the records in question were created or are in the possession of some third person, and not the accused, is not the sine qua non for determining the scope of Article I, paragraph 7, as suggested by the State. The State's position is grounded on United States v. Miller, supra, 425 U.S. at 443, 96 S.Ct. at 1624, 48 L.Ed.2d at 79, where the Court held that the Fourth Amendment "does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." See also Smith v. Maryland, supra, 442 U.S. at 744, 99 S.Ct. at 2582, 61 L.Ed.2d at 229.
Miller's linking of the legitimate expectation of privacy with third person access to information has not been followed by our courts in staking out the boundaries of Article I, paragraph 7. For example, in State v. Hunt, the Court found no great significance in the fact that the telephone company and some of its employees were aware of the telephone numbers dialed by an individual. Instead, the Court held that the availability of access by others is not alone determinative of a legitimate expectation of privacy:
It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons. The toll billing record is a part of the privacy package.
[91 N.J. at 347, 450 A.2d 952.]
Similarly, in State v. Hempele, the Court held that garbage "does not lose constitutional protection merely because it is handed over to a collector." 120 N.J. at 209, 576 A.2d 793. In State v. McAllister, we found a legitimate expectation of privacy in a bank's records concerning an accused's account even though the bank's employees had access to those records. 366 N.J.Super. at 264-65, 840 A.2d 967.
In each of these examples  Hunt's examination of the expectation of privacy in records regarding the telephone numbers dialed, Hempele's discussion of one's expectation of privacy in garbage left on the curb for those authorized to collect it, and McAllister's finding of the right to privacy in financial records maintained by a banking institution  our courts departed from the lesser scope of privacy interests recognized in the Fourth Amendment analysis *646 contained in Miller.[12] In each of those circumstances, the courts adopted a broader scope of what information may be viewed as private in interpreting Article I, paragraph 7 that is not governed by the fact that others may have access to the information in question. Each of those courts recognized that, while relevant, the access of others to the information in question is not solely determinative of a legitimate expectation of privacy.
Of the other jurisdictions that have not found a legitimate expectation of privacy in such records, both the Idaho court in Kluss and the Colorado court in Dunkin chiefly reached their conclusions by relying upon Miller and the fact that the seized records were created and possessed by third persons. See State v. Kluss, supra, 867 P.2d at 254 ("In order to have electricity, Kluss was obliged to obtain the same from WWP [the power company]. Kluss did nothing to create the records except consume power.... The power records were maintained by WWP in the ordinary course of business."); People v. Dunkin, supra, 888 P.2d at 308 (expressly following Kluss in this regard). As observed above, this approach is not illuminating here because it is inconsistent with the manner in which our courts have construed Article I, paragraph 7 in similar circumstances. See Hunt, supra, 91 N.J. at 347, 450 A.2d 952; Hempele, supra, 120 N.J. at 204-05, 576 A.2d 793; Mcallister, supra, 366 N.J.Super. at 264-65, 840 A.2d 967.

2. Do Electrical Usage Records Reveal Intimate Details of Activities Within the Home?
In further analyzing whether there is a legitimate expectation of privacy in the records in question, like Hunt and Hempele we start from the premise that just as the telephone numbers called, and the garbage disposed of, tend to reveal what occurs within the home, so too does the usage of electricity. Indeed, much of what has been said about the illegitimacy of a warrantless thermal scan (designed to determine whether certain areas of a structure were relatively hot when compared to the rest of the home or neighboring homes) is applicable to the finding of a legitimate expectation of privacy in information maintained by a power company as to the usage of electricity. That is  because both the Fourth Amendment and Article I, paragraph 7 possess, "[a]t the very core," the right "to retreat into [one's] own home and there be free from unreasonable governmental intrusion," Silverman v. United States, supra, 365 U.S. at 511, 81 S.Ct. at 683, 5 L.Ed.2d at 739; State v. Cassidy, supra, 179 N.J. at 160, 843 A.2d 1132  the Supreme Court rejected the government's contention that warrantless thermal scanning was constitutional because "it did not `detect private activities occurring in private areas.'" Kyllo, supra, 533 U.S. at 37, 121 S.Ct. at 2045, 150 L.Ed.2d at 104. Instead, as Justice Scalia stated, in speaking for the *647 Court, all the details that relate to what occurs within the home are intimate:
The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In Silverman, for example, we made clear that any physical invasion of the structure of the home, "by even a fraction of an inch," was too much[, 365 U.S. at 512, 81 S.Ct. at 683, 5 L.Ed.2d at 739,] and there is certainly no exception to the warrant requirement for the officer who barely cracks opens the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes. Thus, in [United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984)] the only thing detected was a can of ether in the home; and in Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the only thing detected by a physical search that went beyond what officers lawfully present could observe in "plain view" was the registration number of a phonograph turntable. These were intimate details because they were details of the home, just as was the detail of how warm  or even how relatively warm  Kyllo was heating his residence. [Id. at 37-38, 121 S.Ct. at 2045, 150 L.Ed.2d at 104.]
As can be seen, Kyllo's view of the type of information relating to activities occurring within the home that will trigger the concerns of the Fourth Amendment  namely, all of it  is consistent with how our courts have described the reach of Article I, paragraph 7. See State v. Frankel, supra, 179 N.J. at 611, 847 A.2d 561; State v. Cassidy, supra, 179 N.J. at 159-60, 843 A.2d 1132. Indeed, the Court recently determined that locations other than the home itself could trigger those same concerns. State v. Stott, 171 N.J. 343, 794 A.2d 120 (2002) (a psychiatric patient's hospital room is comparable to a private living area for search and seizure purposes). This presents yet another basis for disregarding the few decisions of other jurisdictions that have found no legitimate expectation of privacy in electrical usage records.
An analysis of the Idaho and Colorado decisions cited earlier demonstrates their incompatibility with Kyllo in its interpretation of the Fourth Amendment and the decisions of our courts cited earlier in interpreting Article I, paragraph 7. Instead of finding that any information about what occurs within the home is subject to protection, the Idaho court in Kluss, quoted with approval by the Colorado court in Dunkin, held that there is no legitimate expectation of privacy in electrical usage records because those courts believed that such records do not identify any intimate activities of the accused:
On a comparative basis [such records] may demonstrate that the power use at the [accused's] home is greater or lesser than similar houses or at similar times or that the power use has increased or decreased at different times. The information does not provide any intimate details of [the accused's] life, identify his friends or political and business associates, nor does it provide or complete a "virtual current biography." The power records, unlike telephone or bank records, do not reveal discrete information about [the accused's] activities. High power usage may be caused by any one of numerous factors: hot tubs, arc welders, poor insulation, ceramic or pottery kilns, or indoor gardening under artificial lights.

*648 [Kluss, supra, 867 P.2d at 254 (quoted with approval in Dunkin, supra, 888 P.2d at 308).]
As discussed in greater detail earlier, this assertion that "waste heat" does not provide intimate details of what occurs within an accused's home does not comport with Kyllo's interpretation of the Fourth Amendment or our own search and seizure jurisprudence. Thus, we choose not to follow the Idaho and Colorado courts, or the different approach taken by the Alaska court in Samson,[13] but instead align our decision with that of the Supreme Court of Washington in Maxfield, supra, 133 Wash.2d 332, 945 P.2d 196, whose opinion bears close similarities to our Supreme Court's opinion in Hunt, supra, 91 N.J. at 347, 450 A.2d 952, which, in fact, is cited as authority by the Court in Maxfield. 945 P.2d at 200.

3. Has our Supreme Court Permitted Warrantless Searches of Utility Records in Prior Decisions?
Our conclusion as to the reasonable expectation of privacy in electrical usage records is not contrary to what the State argues has been held, at least inferentially, in State v. Jones, supra, and State v. Sullivan, supra. Those decisions dealt with the level of reliability in an informant's tip of criminal activity. In State v. Sullivan, the Court determined that a particular tip was reliable as to the name and location of an alleged drug dealer because, among other things, the informant's tip was corroborated by utility records that identified the owner of the premises in question. 169 N.J. at 209, 777 A.2d 60. In State v. Jones, 358 N.J.Super. 420, 428, 818 A.2d 392 (App.Div.2003), we alluded to this fact in distinguishing Sullivan, and when the Supreme Court reversed our judgment in Jones, it also referred extensively to the circumstances in Sullivan and the fact that the officer in Sullivan had corroborated the informant's tip by "review[ing] utility records to confirm that the telephone number provided by the informant matched the telephone number of the apartment in the multi-unit building where the controlled buys were purportedly made." 179 N.J. at 391, 846 A.2d 569. Nowhere in any of those opinions may it be ascertained by what authority the police officer was permitted to examine the utility records. Moreover, there is a distinct difference between a warrantless review of utility records to ascertain the name of an occupant of property, on the one hand, and a review of records relating to the usage of power, on the other. See Commonwealth v. Duncan, 572 Pa. 438, 817 A.2d 455, 459 (2003); cf., Hiibel v. Sixth Judicial Dist. Ct., 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). For present purposes, we need not determine whether a warrantless search of such records  for the sole purpose of identifying the owner of property *649  runs afoul of either the Fourth Amendment or Article I, paragraph 7. Here, the subpoena utilized by Detective Peacock compelled a greater disclosure of information than that which occurred in Sullivan.

4. Summary.
We conclude that there is a legitimate expectation of privacy in electrical usage records maintained by a power company that precludes the intrusion of law enforcement in the absence of a warrant. Ultimately, we find no philosophical distinction to be drawn between the purpose behind excluding evidence obtained from a warrantless thermal scan of a residence and excluding evidence derived from a warrantless search of a utility's records as to electrical usage in an accused's home. Both searches seek information as to the amount of electricity used within a home (to determine whether that use, as compared to other similarly-sized residences, might be compatible with the presence of an indoor garden). Just as there is a constitutional prohibition of warrantless searches of homes by thermal scanning devices that reveal heat emanations, we conclude there must be a constitutional prohibition of warrantless searches of utility records that reveal the amount of electricity used in a home.
As observed earlier in this regard, we find persuasive the Supreme Court of Washington's comparison to the privacy right adhering to telephone records, which is similar to, and indeed based upon, our Supreme Court's decision in Hunt:
Finding a privacy interest in electric consumption records is in keeping with our [prior] holdings.... [W]e [have] held that placing a pen register (which records outgoing telephone numbers) on a telephone line and obtaining long distance records from the telephone company without a warrant were unreasonable intrusions into an individual's private affairs. In reaching that conclusion, we relied in part on the fact that "[a] telephone is a necessary component of modern life" and the necessary disclosure to the telephone company of numbers dialed does not change the caller's expectation of privacy "into an assumed risk of disclosure to the government." "This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited purpose and not for release to other persons for other reasons."
Those rationales also apply to electric consumption records. Electricity, even more than telephone service, is a "necessary component of modern life," pervading every aspect of an individual's business and personal life: it heats our homes, powers our appliances, and lights our nights. A requirement of receiving this service is the disclosure to the power company (and in this case an agent of the state) of one's identity and the amount of electricity being used. The nature of electrical service requires the disclosure of this information, but that disclosure is only for the limited business purpose of obtaining the service.
[Maxfield, supra, 945 P.2d at 200-01 (quoting not only its own prior precedents but also Hunt, supra, 91 N.J. at 347, 450 A.2d 952).]
We agree.
We also observe that such a determination may, at times, be affected by policy reasons. For example, in Hunt, the Court noted that "New Jersey has had an established policy of providing the utmost protection for telephonic communications," and referred to the Legislature's criminalization of wiretapping as early as 1930 in a statute since superseded by the Wiretapping *650 and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -34. 91 N.J. at 345, 450 A.2d 952. Neither party has provided us with any guidance as to the legislatively-recognized existence, or lack of existence, of an expectation of privacy in electrical usage records. Indeed, we note that the Open Public Records Act, N.J.S.A. 47:1A-1 to -13, merely begs the question by stating that "a public agency [such as a public utility] has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." N.J.S.A. 47:1A-1.[14]
In this same vein, we would lastly note that we view as incongruous the State's unsupported suggestion that members of the public may freely inspect such records in light of the fact that Detective Peacock felt the need to obtain a subpoena in order to compel their turnover.
For the reasons we have indicated, we conclude that a search warrant is required for utility records that reveal the amount of electricity used in an individual's home. Because Detective Peacock obtained such records by way of a subpoena, and not by way of a warrant issued by an impartial judge, we conclude that this search was unlawful.

IV
Having determined that the police had previously engaged in unlawful searches during their investigation of defendant, we remand for further proceedings regarding defendant's motion to suppress in order that there may be consideration of the impact of these prior constitutional violations on the State's contentions that defendant consented to the search of his home on July 27, 2000 and that the results of that search are admissible.
As is apparent, the proceedings on remand must not be limited solely to a determination as to the taint of the prior unlawful searches on the consent that the trial judge found was given. Instead, it must again be considered whether consent was given  and given voluntarily  because at the prior hearing the trial judge did not *651 permit the full (or any) use of the prior unlawful searches nor did he consider how that unlawful conduct called into question the credibility of the State's version of the July 27, 2000 events. On remand, the judge should consider but not necessarily be limited to weighing the impact of the prior unlawful police conduct (1) on the credibility of the police version of the alleged consent search, (2) on the legitimacy of the manner in which the police sought consent, and (3) on whether the police had a reasonable suspicion that would justify seeking defendant's consent to a search of his home. In addition, even if it is found after such an examination that defendant freely and voluntarily consented to the search of his home, the judge must also consider whether that consent was tainted by the prior unlawful conduct. We briefly expand on these points.
In weighing the circumstances eventually revealed at the future suppression hearing, the judge must first determine how the prior unlawful conduct impacts upon the credibility of the police version of what occurred on July 27, 2000. In determining whether consent was requested or given, the judge should weigh whether the prior unlawful conduct might suggest that consent was not lawfully obtained. For example, among other ways in which the credibility of the State's version may be challenged, the judge may consider whether the manner in which defendant asserted that the investigating officers effected their "knock and talk" is more believable than what the trial judge originally thought when illumined by the prior willingness of the police to engage in unlawful conduct. In other words, the judge is entitled to doubt the likelihood that the officers acted in a constitutionally permissible manner on July 27, 2000 when they did not so act on prior occasions. And while a strict application of N.J.R.E. 404(b)[15] might suggest the preclusion of the officers' prior wrongful acts, it is well-established that the rules of evidence do not apply at suppression hearings. N.J.R.E. 104(a).[16] We therefore conclude that evidence of prior unlawful searches is relevant not only to a consideration of whether the search of defendant's home constitutes the "fruit of the poisonous tree," as more fully discussed later in this opinion, but also in analyzing whether the unlawfulness of the search in question is suggested by the unlawfulness of prior searches.
Second, we similarly conclude that the trial judge mistakenly rejected the significance of the fact that the officers, by passing through a gate and entering defendant's backyard, had entered the curtilage of defendant's home without consent, without a warrant and without probable cause. While we recognize that the federal and state constitutional prohibitions on unreasonable searches and seizures do not "bar all police observation" and have "never been extended to require law enforcement officers to shield their eyes when passing by a home," and, for example, have not been found to bar a warrantless aerial observation of a fenced-in backyard, California v. Ciraolo, 476 U.S. 207, 213, 106 *652 S.Ct. 1809, 1812, 90 L.Ed.2d 210, 216 (1986), there are limits to the extent to which the police may make a warrantless entry into the curtilage of an individual's home. On remand, the judge may consider whether the warrantless intrusion by Detective Peacock and another officer into the gated backyard of defendant's property transgressed defendant's expectation of privacy and how, if unlawful, it may impact upon the credibility of the State's contention that the police acted lawfully when seeking defendant's consent to a search of his home. For instance, assuming the truth of defendant's contention that the officers entered his home from both the front and back doors, that coordinated action might provide evidence to suggest that defendant's subsequent consent to the search was coerced. See, e.g., Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 416-17, 9 L.Ed.2d 441, 454 (1963). By the same token, the judge should permit and consider any other evidence the State may seek to offer to justify the manner in which they approached defendant's home.
Third, the judge should consider whether the police had sufficient information from which to seek defendant's consent to the search of his home. To seek consent for such a search, the officers' existing, lawfully-obtained information must have been sufficient to generate a reasonable and articulable suspicion that criminal activity was occurring within. See State v. Carty, supra, 170 N.J. at 647, 790 A.2d 903.[17]
We would seriously question whether this standard could be met on the evidence presently in the record since evidence that the accused lawfully purchased legal plant growth equipment, standing alone, cannot form an adequate predicate for seeking consent based upon the Carty standard. However, because the limitations imposed upon the scope of the prior suppression hearing may have prevented the State from offering other proof that may meet this standard even in the absence of whatever the tainted searches revealed, our remand should not be viewed as barring testimony of such other lawfully obtained evidence that might be sufficient to support a finding of a reasonable and articulable suspicion of criminal activity that would have justified a request for consent to search defendant's home.
In so describing the potential uses of this evidence, we intimate no view of how this or any other evidence should be weighed. We do, however, reject any future application of the independent source rule in this case. The application of that rule requires that the State demonstrate, by clear and convincing evidence, that "probable cause existed to conduct the challenged search without the unlawfully obtained information." State v. Holland, 176 N.J. 344, 360-61, 823 A.2d 38 (2003). Here, it was conceded that the police lacked probable cause to obtain a search warrant of defendant's home even with the unlawfully obtained information.
And lastly, even if the judge determines on remand that defendant freely and voluntarily gave his consent to a search of his home, and even if the judge determines on remand that the police had a reasonable and articulable suspicion to seek defendant's consent to that search notwithstanding the exclusion of the unlawfully obtained *653 evidence, the judge must determine whether that consent search was tainted by the prior unlawful police conduct. We discern from his findings, as well as his limitation of defense counsel's cross-examination of Detective Peacock, that the trial judge viewed the law enforcement activities that preceded the alleged consent search to be irrelevant. This was mistaken.
Whether a consent search cleanses the taint of prior illegal searches and seizures is not always clear. However, there is no doubt that a mere finding that the subsequent consent was free and voluntary is not alone sufficient to avoid the impact of the "fruit of the poisonous tree" doctrine. If we were to accept the trial judge's view that defendant's purported consent rendered irrelevant the prior unlawful police conduct, we would undermine the purposes of that doctrine. Such a holding would have a tendency to allow the police to conduct illegal searches and seizures with impunity, knowing that consent might later be readily forthcoming when the accused is confronted by police, armed with knowledge illegally obtained, and thereby absolve the police of the impact of their prior unlawful conduct. Such an approach, if adopted, would eviscerate the exclusionary rule's deterrent effect.
The Supreme Court held in Brown v. Illinois, 422 U.S. 590, 601, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416, 426 (1975) that the exclusionary rule is "directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits." It bars illegally-seized evidence even when obtained indirectly. State v. Johnson, 118 N.J. 639, 652, 573 A.2d 909 (1990). Indirectly obtained evidence is considered to be "the fruit of the poisonous tree," and may not be introduced unless it has been obtained "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, supra, 371 U.S. at 487-88, 83 S.Ct. at 417, 9 L.Ed.2d at 455; State v. Johnson, supra, 118 N.J. at 652, 573 A.2d 909.
In providing guidance to the trial court in its future examination into whether the purported consent search was "fruit of the poisonous tree," we observe that the exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Leon, supra, 468 U.S. at 906, 104 S.Ct. at 3412, 82 L.Ed.2d at 687. Accord State v. Johnson, supra, 118 N.J. at 651, 573 A.2d 909 ("The purpose of the exclusionary rule is to deter police misconduct and to preserve the integrity of the courts."); State v. Barry, 86 N.J. 80, 87, 429 A.2d 581, cert. denied, 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981). By generating the serious consequence of rendering relevant evidence inadmissible, the exclusionary rule seeks to deter police misconduct by encouraging "those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system." Stone v. Powell, 428 U.S. 465, 492, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067, 1087 (1976). We do not discount the fact that the consent search constitutes a valuable investigatory method, Schneckloth v. Bustamonte, supra, 412 U.S. at 228, 93 S.Ct. at 2048, 36 L.Ed.2d at 863, and is a well-recognized exception to the warrant requirement found within the Fourth Amendment and Article I, paragraph 7, id. at 228, 93 S.Ct. at 2048, 36 L.Ed.2d at 863; State v. Carty, supra, 170 N.J. at 650, 790 A.2d 903. However, such a search may still fall to the requirements of the exclusionary rule when it is tainted by prior illegal *654 police action. When the gathering of evidence through official misconduct is followed by and sufficiently linked to a search that, standing alone, appears free and voluntary, the values of legitimate police investigation are overridden by society's need to deter unlawful police conduct.
In his concurring opinion in Brown v. Illinois, Justice Powell explained that a "but for" rule was rejected by the Court in analyzing whether the taint of unlawful police conduct bars the use of its fruit because it was recognized "that in some circumstances strict adherence to the Fourth Amendment exclusionary rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes." 422 U.S. at 608-09, 95 S.Ct. at 2264, 45 L.Ed.2d at 430. Thus, in considering the totality of the circumstances, and upon a careful weighing of all relevant evidence, a fact-finder may conclude that the taint of the illegal searches has become attenuated. Brown, supra, 422 U.S. at 602-03, 95 S.Ct. at 2261, 45 L.Ed.2d at 426-27; State v. Carty, supra, 170 N.J. at 651, 790 A.2d 903; State v. Barry, supra, 86 N.J. at 87, 429 A.2d 581. While its facts and circumstances are distinguishable, Brown v. Illinois demonstrates that subsequent consent to a search alone is insufficient to remove the taint of a prior constitutional violation, and instead should be examined as one part of an amalgam of circumstances to be weighed in determining whether the evidence obtained from the consent search may be viewed as untethered to the prior unlawful conduct. 422 U.S. at 603-04, 95 S.Ct. at 2261-62, 45 L.Ed.2d at 427. Among the factors that should be weighed in determining whether the evidence has been obtained by means that are "sufficiently independent to dissipate the taint" of the unlawful police conduct, are:
(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct. [State v. Johnson, supra, 118 N.J. at 653, 573 A.2d 909 (citing Brown v. Illinois, supra, 422 U.S. at 603-04, 95 S.Ct. at 2261-62, 45 L.Ed.2d at 427).]
This analysis is fact-sensitive, Brown v. Illinois, supra, 422 U.S. at 604 n. 10, 95 S.Ct. at 2262 n. 10, 45 L.Ed.2d at 427 n. 10; State v. Johnson, supra, 118 N.J. at 653, 573 A.2d 909, and is often relegated to "the learning, good sense, fairness and courage" of trial judges, Nardone v. United States, 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). The extent to which our courts may distinguish between what is or is not attenuated is not entirely clear beyond these general guidelines. There are no available bright lines. We would observe, however, that our Supreme Court recently recognized that a consent search could remain tainted by prior unlawful police conduct "notwithstanding that [defendant] consulted with an attorney prior to consenting." State v. Cassidy, supra, 179 N.J. at 164, 843 A.2d 1132. See also State v. Johnson, supra, 118 N.J. at 658, 573 A.2d 909 (where the Court held that the intervening events in that case were "repeated violations of defendant's constitutional rights" that "did not break, but rather forged, the chain of causation").

V
In his supplemental brief, defendant argues that the trial judge erred by barring testimony about the results of a polygraph examination performed on defendant, including, we suppose, the expert's opinion that defendant's contention that he did not consent to the search was truthful. In this regard, the following occurred at the hearing:

*655 THE COURT: Any other witnesses... ?
[DEFENSE COUNSEL]: Yes, I would like to call Allen Hart please.
[ASSISTANT PROSECUTOR]: Your Honor, I believe we're going to need to have a motion with respect to Mr. Hart's testimony.
THE COURT: Mr. Hart is a pol[y]grapher?
[DEFENSE COUNSEL]: Yes, sir ... [,] he performed a polygraph on [defendant].
THE COURT: And determined what?
[DEFENSE COUNSEL]: And he determined that he was truthful in what he said, that 
THE COURT: Doesn't that call for the ultimate question? Isn't the finder of fact at this proceeding to make that determination?
[DEFENSE COUNSEL]: It calls for a significant statement towards the ultimate fact, I agree but this is a Rule 104 Hearing. As we set forth in our brief, the Rules of Evidence don't apply. All of the authorities that the State has cited in support of their position are cases that say that polygraph evidence is not admissible before the jury. The court sitting by itself in a Rule 104 Hearing without a jury with relaxed evidence procedures can determine what weight if anything it's going to give to a polygraph exam.
THE COURT: Well, I'm certainly not going to take the time,. . . . I don't think it's relevant to anything being determined as to the ultimate issue of credibility at this point. It's not his function. It's my function.
[DEFENSE COUNSEL]: He's not talking about credibility, he's talking about the results of a polygraph test that this court would weigh into  weigh into evidence.
THE COURT: I'm not going to weigh into evidence. It wouldn't be admissible in any event. I'm going to deny your application.
As can be seen, the trial judge summarily refused to permit this testimony because he considered it irrelevant ("I don't think it's relevant to anything being determined..."), and ultimately inadmissible ("It wouldn't be admissible in any event"). The judge also ruled that this testimony encroached upon the ultimate issue to be decided ("the ultimate issue of credibility [is] not his function ... [i]t's my function"), and that it constituted a waste of time ("I'm certainly not going to take the time ..."). We conclude that these four reasons given by the trial judge were insufficient to justify the exclusion of this testimony.

A
The determination that this evidence was irrelevant was based upon a mistaken view of the rules of evidence. N.J.R.E. 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." The judge was required, in part, to determine whether defendant consented to the search of his home, which turned on the "swearing contest" between Detective Peacock and defendant about what actually occurred on July 27, 2000. Since the polygraph testimony related, no matter how imperfectly, to the truthfulness of defendant's version, it comported with N.J.R.E. 401's broad standard of what is relevant. See United States v. Posado, 57 F.3d 428, 433 (5th Cir.1995).

B
The trial judge also summarily excluded the polygraph testimony because *656 he believed it was inadmissible. This was also erroneous. In State v. McDavitt, 62 N.J. 36, 46, 297 A.2d 849 (1972), the Court held that polygraph testing had developed to such a point of reliability that the results could be admitted into evidence in a criminal matter if both the State and defendant so stipulated. In reaching this determination, the McDavitt Court took judicial notice "of the fact that polygraph testing is used extensively by police and law enforcement agencies, government agencies and private industry for investigative purposes." Id. at 45, 297 A.2d 849. The Court explained that polygraph evidence "has probative value to warrant admission" under the stipulation circumstances it outlined and cautioned that juries should be carefully instructed that:
It is not direct proof of a defendant's guilt or innocence of the crime charged. It is opinion evidence by an expert and tends only to indicate whether or not the subject was telling the truth when tested. It is for the jury to decide what weight and effect such evidence should be given.
[Id. at 47, 297 A.2d 849.]
See also State v. Carter, 91 N.J. 86, 116, 449 A.2d 1280 (1982); State v. Castagna, 376 N.J.Super. 323, 870 A.2d 653 (App.Div. 2005); State v. Reyes, 237 N.J.Super. 250, 567 A.2d 287 (App.Div.1989); State v. Capone, 215 N.J.Super. 497, 522 A.2d 451 (App.Div.1987). These decisions, while limiting the admissibility of such evidence, recognize that polygraph testing has some probative value and, thus, the trial judge's contrary view was erroneous.
Polygraph testing is designed to demonstrate that the person tested was or was not truthful in answering certain questions based upon measured changes in blood pressure, pulse, thoracic and abdominal respiration, and galvanic skin response. The polygraph as a device for detecting truthfulness is based upon the assumption that changes in these physical conditions indicate an increase in stress consistent with deception. See, e.g., United States v. Piccinonna, 885 F.2d 529, 1538 (11th Cir. 1989) (Johnson, J., concurring in part and dissenting in part). We conclude that in a non-jury setting the admission of this type of evidence, when a proper foundation has been laid, is not limited by McDavitt's stipulation requirement.
In weighing the admissibility of such evidence in the present circumstances, our judicial system recognizes that cases are already adjudicated through the use of "lie detectors." We principally believe  and for good reason  that the truth may be determined and lies detected in the crucible of a trial where testimony is given under oath and subjected to cross-examination. We also believe that lies may be detected through a fact-finder's use of common sense in judging the logic and sense of what a witness has said and the manner in which the witness has said it. That is, it is well-established that a fact-finder is permitted to assess the credibility of a witness not only through the sense or logic of what has been said under oath  on the assumption that the witness will speak the truth either through fear of criminal prosecution, N.J.S.A. 2C:28-1 and 2, or moral compulsion  but also through an assessment of the witness's demeanor. See Model Jury Charges (Civil), § 1.12K (1998) (the fact-finder may consider, among other things, "the witness' demeanor on the stand; the witness' candor or evasion; the witness' willingness or reluctance to answer"). If we are to allow a fact-finder to detect whether a witness is lying or telling the truth based on observations of demeanor  thus permitting the fact-finder to consider among many other things whether, while testifying, the witness *657 breathed heavily, perspired, spoke haltingly, avoided eye contact, gestured excessively, or gave off the unpleasant "odor of mendacity"[18]  then it should follow that measurable physiological occurrences during the answering of questions, such as changes in pulse rate, blood pressure, respiration or perspiration, may be probative of a witness's credibility.
In so viewing the information that polygraph evidence may provide, we must consider whether McDavitt requires the exclusion of such evidence. In McDavitt, the Court outlined the circumstances in which polygraph evidence may be used, indicating that in a criminal case the parties must stipulate to its admission. Here, while the parties did not enter into such a stipulation, the circumstances are distinguishable from McDavitt, chiefly because McDavitt considered the use of polygraph evidence at a trial, before a jury, to determine defendant's guilt. Thus, in weighing the applicability of this stipulation requirement, we have recognized and stressed that McDavitt dealt with the admissibility of such evidence when the fact-finder is a jury. See Castagna, supra, 376 N.J.Super. at 352, 870 A.2d 653 (emphasis added) ("[U]ntil our Supreme Court says otherwise, the only way to bring directly before a jury the results of a polygraph test is for the parties to stipulate to its admissibility."). We have not, however, previously considered whether McDavitt's stipulation requirement should apply to limit the use of polygraph evidence when the judge is required to find facts at a suppression hearing.
Here, the motion to suppress was for the trial judge to decide based upon his  and not a jury's  determination of the facts. In such a circumstance, as defendant correctly urges, "the judge shall not apply the rules of evidence except for Rule 403 or a valid claim of privilege." N.J.R.E. 104(a). The concern expressed in prior decisions has been that, until some definitive proof demonstrates the greater reliability of the polygraph technique, a jury may tend to be confused or misled by its admission. This concern, however, is not presented when the judge is the fact-finder. Instead, in such circumstances, the rules of evidence have a less rigid application. Accordingly, while the Supreme Court has placed limits on the use of such evidence, we conclude that the stipulation requirement of McDavitt governs when the fact-finder is a jury and that polygraph evidence may be admitted, in the absence of a stipulation, at a suppression hearing where the judge is the fact-finder. United States v. Posado, supra, 57 F.3d at 435. As a result, polygraph evidence may be admitted at a suppression hearing, even in the absence of the consent of the State, when credibility is an issue.[19] The judge may give that testimony such weight as it warrants, but the extent to which the judge values that evidence should not determine its admissibility.

C
The trial judge was also mistaken in holding that the polygrapher's testimony usurped his function as the fact-finder because it embraced the ultimate issue. *658 See N.J.R.E. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."); State v. Summers, 176 N.J. 306, 312, 823 A.2d 15 (2003); Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 497, 608 A.2d 304 (1992).

D
Lastly, we observe that the trial judge appears to have precluded the polygrapher's testimony because he believed it would constitute a waste of time. Certainly, the trial judge has the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the risk of ... [it being a] waste of time." N.J.R.E. 403(b).
Some of the judge's comments suggest that he viewed this evidence as a "waste of time" because he believed the testimony was inadmissible. That conclusion was incorrect and, in actuality, did not result from the balancing process required by N.J.R.E. 403(b).
To the extent that the judge's holding in this regard could be viewed as being based on N.J.R.E. 403(b), we would also reject it. The record gives no cause to believe that the polygrapher's testimony, and any rebuttal the State may have wished to offer, would have been so time consuming as to outweigh the testimony's probative value. The judge did not inquire as to how long the examination of the polygrapher would take. Nor did the judge inquire whether the State would offer any rebuttal or how long that rebuttal would take. Absent such information, the trial judge was in no position to consider whether the "waste of time" aspect of N.J.R.E. 403 was implicated and, thus, his preclusion of this evidence on that basis constituted an abuse of discretion.

E
For these reasons, we hold only that the admissibility of this evidence should not have been barred for any of the reasons asserted by the trial judge. Our discussion of the judge's ruling, therefore, should not be interpreted as foreclosing a renewal of a N.J.R.E. 403 objection to the polygraph testimony on a more complete record. In addition, we know nothing of this polygrapher's qualifications, the content of his proposed direct testimony, or how the State's voir dire or cross-examination of the polygrapher might impact upon the admissibility or persuasiveness of his testimony, and can therefore neither offer nor intimate any view as to whether this polygrapher possessed valid qualifications or how the trial judge should weigh this evidence if it is ultimately admitted.
In short, we decide what has been presented and conclude only that the trial judge's reasons for excluding defendant's polygraph evidence were erroneous.

VI
For these reasons, we vacate the judgment of conviction, vacate the order denying defendant's motion to suppress, and remand for further proceedings in conformity with this opinion.
We are also constrained, in light of the trial judge's prior expressions regarding the credibility of the witnesses, to direct that the matter be heard by another judge. In so holding, we intend no denigration of the experienced trial judge, but conclude that his prior findings, substantially based on his view of the credibility of the witnesses, have placed him in the uncomfortable position that R. 1:12-1(d) was designed to avoid. See N.J. Div. of Youth & Fam. Serv. v. A.W., 103 N.J. 591, 617-18, 512 A.2d 438 (1986) ("Because the trial judge has heard this evidence and may *659 have a commitment to its findings, we believe it is best that the case be reconsidered by a new fact-finder."); In re Guardianship of R., G. and F., 155 N.J.Super. 186, 195, 382 A.2d 654 (App.Div.1977) ("The [termination of parental rights] case should be assigned to a new judge [because] [t]he judge who heard the matter below has already engaged in weighing the evidence and has rendered a conclusion on the credibility of the Division's witnesses."); see also State v. Gomez, 341 N.J.Super. 560, 579, 775 A.2d 645 (App. Div.), certif. denied, 170 N.J. 86, 784 A.2d 719 (2001). The Assignment Judge of the vicinage should forthwith assign a different judge to conduct all further proceedings in this matter.
Reversed and remanded.
NOTES
[1] We observe that defendant indicated his waiver of a right to appeal as part of the plea agreement. Notwithstanding, defendant filed this appeal and the State has not argued that it should be dismissed. Accordingly, we conclude that the State waived its right to assert defendant's waiver as a basis for our rejecting his appeal.
[2] This date is suggested only by Detective Peacock's testimony that he performed the thermal scan "over two months" prior to defendant's arrest.
[3] Defendant testified that the officers arrived "[e]arly morning, 7:00, 8:00 o'clock." The State provided no evidence as to the time of the officers' arrival nor did the State attempt to rebut defendant's testimony in this regard.
[4] Neither Detective DeBiase nor any of these other officers testified at the hearing.
[5] Detective Peacock testified that he normally coordinates such investigations with local officials.
[6] This explanation does not explain why the other three officers approached and knocked on the front door.
[7] United States v. Ishmael, 48 F.3d 850 (5th Cir.1995); United States v. Myers, 46 F.3d 668 (7th Cir.1995); United States v. Pinson, 24 F.3d 1056 (8th Cir.1994); United States v. Ford, 34 F.3d 992 (11th Cir.1994); State v. Cramer, 174 Ariz. 522, 851 P.2d 147 (Ct.App. 1992); LaFollette v. Commonwealth, 915 S.W.2d 747 (Ky.1996); State v. Niel, 671 So.2d 1111 (La.Ct.App.1996); State v. McKee, 181 Wis.2d 354, 510 N.W.2d 807 (Ct.App. 1993).
[8] United States v. Cusumano, 67 F.3d 1497 (10th Cir.1995), vacated on other grounds, 83 F.3d 1247 (10th Cir.1996); People v. Deutsch, 44 Cal.App.4th 1224, 52 Cal.Rptr.2d 366 (1996); State v. Siegal, 281 Mont. 250, 934 P.2d 176 (1997), overruled on other grounds, State v. Kuneff, 291 Mont. 474, 970 P.2d 556 (1998); Commonwealth v. Gindlesperger, 560 Pa. 222, 743 A.2d 898 (1999); State v. Young, 123 Wash.2d 173, 867 P.2d 593 (1994).
[9] Our state constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized." N.J. Const., Article I, paragraph 7.
[10] In his concurring opinion in Hunt, Justice Pashman observed that state courts, "if not discouraged from independent constitutional analysis, can serve, in Justice Brandeis' words, `as a laboratory' testing competing interpretations of constitutional concepts that may better serve the people of those states. In our federal system, there is strength in diversity and competition of ideas." 91 N.J. at 356-57, 450 A.2d 952 (quoting New State Ice Co. v. Liebmann, 285 U.S. 262, 310-11, 52 S.Ct. 371, 386, 76 L.Ed. 747, 771 (1931)(Brandeis, J., dissenting)). See also Note, Developments in the Law  The Interpretation of State Constitutional Rights, 95 Harv.L.Rev. 1324, 1396 (1982) ("Rather than threaten the federal system, such a process is more likely to create a healthy debate over the interpretation of federal law.").
[11] The issue has been inconclusively discussed by other courts. In Commonwealth v. Duncan, 752 A.2d 404, 412 n. 6 (Pa.Super.2000), the court declined to consider the issue but indicated that the Pennsylvania Supreme Court had found a reasonable expectation of privacy in the heat escaping from one's home, see Commonwealth v. Gindlesperger, 560 Pa. 222, 743 A.2d 898 (1999), and cited the one known decision that found an expectation of privacy in utility records, suggesting perhaps an inclination toward finding a legitimate expectation of privacy in such records. That decision was affirmed, but on other grounds. 572 Pa. 438, 817 A.2d 455 (2003). In State v. Mordowanec, 259 Conn. 94, 788 A.2d 48, 56 n. 11 (2002), the court stated that defendant had failed to raise the issue in the trial court, but concluded in dictum that United States v. Miller, supra, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71, was dispositive. See also the three opinions in United States v. Porco, 842 F.Supp. 1393, 1398 (D.Wyo.1994), aff'd on other grounds, sub nom., United States v. Cusumano, 67 F. 1497 (10th Cir.1995), vacated, 83 F.3d 1247 (10th Cir.1996) (en banc). The district judge determined that an affidavit submitted to a magistrate for issuance of a search warrant provided a substantial basis for concluding that probable cause existed for a search of defendant's home. Included within that affidavit were the results of a thermal scan and information derived from a utility company's electrical usage records for that residence. In considering this issue, the district judge held that a thermal scan was not a search protected by the Fourth Amendment and that defendants had no expectation of privacy in electrical usage records. 842 F.Supp. at 1398. On appeal, the panel never discussed the latter point, holding instead that the thermal scan was a search that required a warrant and, thus, information derived from that warrantless scan could not be considered in determining whether probable cause existed for a search of the residence. 67 F.3d at 1502-07. The entire court granting rehearing en banc, vacated the panel's decision reported at 67 F.3d 1497, but chose not to determine whether a warrant is required for a thermal scan, 83 F.3d at 1250, and never mentioned the electrical usage records; instead, the majority of the en banc court held that there was sufficient other evidence to support a finding of probable cause and affirmed the district court's denial of defendants' suppression motion.
[12] Indeed, the State's brief trumpets this point on the assumption that our courts would follow United States v. Miller, without citing McAllister, where we rejected Miller's approach in interpreting Article I, paragraph 7. See also the insightful and persuasive criticism of Miller in 1 LaFave, Search and Seizure § 2.7(c) (4th ed., 2004) ("Despite the fact that the volume and personal nature of [banking] information is such that access by government agents unrestrained by constitutional limitations would seem to constitute a devastating intrusion into privacy, courts have not been receptive to the assertion that the subjects of this information are at all protected by the Fourth Amendment against this kind of surveillance. In light of the unfortunate decision of the Supreme Court in United States v. Miller, they are even less likely to accept such a contention.").
[13] The Alaska court concluded that the defendant did not have standing to seek suppression of the utility records. See Samson v. State, supra, 919 P.2d at 174 (concurring opinion of Mannheimer, J., which contains the majority's resolution of this issue) ("Because these records were complied and kept by Golden Valley Electric, and because the records were seized from the electric company's premises, Golden Valley clearly would be entitled to seek suppression of this evidence if the government ever attempted to use these records in a criminal prosecution of the electric company. But Samson is in a different legal position because, normally, a person has no standing to seek suppression of evidence belonging to and illegally seized from someone else."). This view of standing may perhaps be consistent with the federal approach, see Rakas v. Illinois, supra, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, but is entirely inconsistent with the concept of standing adopted by our Supreme Court in such matters, see State v. Alston, supra, 88 N.J. at 211, 440 A.2d 1311.
[14] We are aware of no other legislative enactments that would shed any clear light on this subject, although the legislative history relating to a recent enactment seems to suggest that such utility records are considered confidential by public utilities. In seeking to "lower the current high cost of energy," N.J.S.A. 48:3-50, the Legislature adopted in 1999 the Electric Discount and Energy Competition Act, N.J.S.A. 48:3-49 to -98. This Act which, among other things, authorized government aggregation in the energy marketplace, was amended in 2003. In the Assembly Appropriations Committee Statement relating to that amendment, it was reported that the bill "remove[d] a requirement that the consent of an energy customer to disclose the customer's name, address and the current energy company from which the customer purchases electricity, gas or both be in writing, and further allows that disclosure, without the customer's consent, to electric power or gas suppliers (including energy marketers and brokers), energy agents, or municipal governments acting as energy purchasing aggregators, for the purpose of entering into municipal energy aggregation contracts. That information disclosed without consent shall be used only for the provision of electric generation service, gas supply service, or related electric or gas services to that customer." N.J.S.A. 48:3-93.1, Assembly Appropriations Committee Statement to L. 2003, c. 24. We infer from this that, in the absence of a customer's written consent, there is a limited scope of information that may be provided (name, address and current energy company) for a limited purpose ("only for the provision of electric generation service, gas supply service, or related electric or gas services to that customer"). This suggests that other information may not be disclosed or revealed absent customer consent.
[15] This rule states in part that evidence of prior wrongs, although admissible for other purposes, "is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith."
[16] N.J.R.E. 104(a) states that "[w]hen ... the admissibility of evidence ... is in issue, that issue is to be determined by the judge. In making that determination the judge shall not apply the rules of evidence except for Rule 403 or a valid claim of privilege" (emphasis added). Accordingly, N.J.R.E. 404(b) does not bar the admission of such evidence at a suppression hearing unless N.J.R.E. 403 requires its exclusion.
[17] While Carty dealt with the consent to search a motor vehicle, we would conclude that it would be incongruous to view Carty as being limited to motor vehicles since intrusion into the privacy of the home is "the chief evil" that the Fourth Amendment and Article I, paragraph 7 were designed to prevent. The State should not have a greater lawful ability to seek consent to search a home than it has in seeking consent to search a motor vehicle.
[18] Williams, Cat On A Hot Tin Roof, Act III (1955).
[19] We recognize the possibility that our ruling in this regard could turn some suppression hearings, where credibility is a central issue, into battles between polygraphers. In some matters, the State may have its own witness submit to a polygraph examination and offer similar testimony as to the truthfulness of the State's contentions. While that issue has not been presented, we would think the State would be entitled to offer the same type of evidence as the defendant.